[No. F008620. Fifth Dist., Aug. 31, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRELL WILFRED JEFF, Defendant and Appellant.

310

## COUNSEL

Harvey R. Zall, State Public Defender, under appointment by the Court of Appeal, Monica Knox, Acting State Public Defender, and Thomas L. Carroll, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janet G. Bangle and Cynthia G. Besemer, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARTIN, Acting P. J.**—On October 20, 1986, the Madera County District Attorney filed an information in superior court charging defendant as follows: counts I, II, III, XII, XIII, XIV, XXIII, XXIV and XXV—rape (Pen. Code, § 261, subd. (2));[1] counts IV, V, VI, XV, XVI, XVII, XXVI, XXVII and XXVIII—sodomy (§ 286, subd. (c)); counts VII, VIII, XVIII, XIX, XXIX and XXX—oral copulation (§ 288a, subd. (c)); and counts IX, X, XI, XX, XXI, XXII, XXXI, XXXII and XXXIII—lewd and lascivious conduct with a child under age 14 (§ 288, subd. (a)). The district attorney further alleged in the commission of the offenses defendant engaged in substantial sexual conduct (§ 1203.066, subd. (a)(8)), occupied a position of

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

special trust (§ 1203.066, subd. (a)(9)), and committed carnal abuse upon a female under age 10 (§ 645).

After trial, the jury returned verdicts finding defendant guilty on all counts and finding the special allegations to be true. At the sentencing hearing, the trial court denied defendant probation and sentenced him to 27 years in state prison. The court imposed the lower term of three years on counts I, II, III, XII, XIII, XIV, XXIII, XXIV and XXV (rape), with each count to be fully consecutive to the other counts. The court imposed the middle term of six years on counts IV, V, VI, VII, VIII, XV, XVI, XVII, XVIII, XIX, XXVI, XXVII, XXVIII, XXIX and XXX (sodomy and oral copulation), each count to be concurrent to the other terms imposed. The court also imposed the middle term of six years on counts IX, X, XI, XX, XXI, XXII, XXXI, XXXII and XXXIII (lewd and lascivious conduct), with the sentence on each count stayed pursuant to section 654.

Defendant filed a timely notice of appeal.

## FACTS

Gene and Morana C. owned two adjacent homes in North Fork, California. The C.'s had three daughters, June, Sadie, and Karen. Defendant was married to Sadie. Gene and Morana lived in one house with their teenage daughter, June. From 1977 through 1984, Sadie and defendant lived in the other house with their three children. At the time of trial, defendant's children were ten, nine and eight years old, respectively.

Karen married and on July 11, 1975, gave birth to a daughter, Gypsy. From 1976 until 1981, Gypsy lived with her grandparents, Gene and Morana. During those years, the defendant helped raise Gypsy and bring her up like one of his own children.

In 1981, Karen married Karl O. and took Gypsy to live with them in Madera. Gypsy periodically visited her grandparents in North Fork in later years but never lived with them again.

Sometime between 1983 and 1985 Gypsy told her mother and teenage stepsister, Sandra O., the defendant had molested her. According to Gypsy, she informed Sandra of the molestations during the summer of 1984 while the two of them were at her grandparents' house in North Fork. Gypsy said she did not tell Sandra everything defendant had done, just that he had been hurting her.

Sandra said Gypsy told her of the molestations sometime in December 1983.[2] Sandra was able to pinpoint the year because Gypsy told Sandra at their parents' home on San Carlos Avenue in Madera. Sandra moved to that home with her parents and Gypsy during the summer of 1983 but had moved away by the following summer and was no longer living with the family.

Gypsy told her mother of the molestations at Sandra's urging. Karen disbelieved Gypsy and did nothing. However, despite her initial reaction, Karen approached her mother sometime in 1985 and told her Gypsy had accused defendant of molestation. Morana did not believe the report.

At the end of 1985, the entire C. family spent Christmas in Madera with Karl and Karen. Gene, Morana, defendant and Sadie all said Gypsy acted normally that day. She did not exhibit fear of the defendant or seem depressed or otherwise unsettled.

During the summer of 1986, Gypsy began seeing counselor Nancy Le-Blank. Gypsy told LeBlank the defendant had molested her. At about the same time she again told her mother the defendant had molested her.

In June 1986, Karen again told her mother that Gypsy was accusing defendant of molestation. Prompted by that conversation, Morana wrote Sadie a letter. Morana stated both Karen and Gypsy's psychiatrist were accusing defendant of "molesting" his own daughters and "messing around" with Gypsy.

Sadie received the letter on Friday, June 13, 1986. When defendant arrived home from work, she showed the letter to him. Defendant testified he was shocked when he read the letter. However, he only focused his attention on the portion of the letter accusing him of molesting his own daughters. Defendant testified there was a significant difference to him between "molesting," which suggested sexual acts, and "messing around," which meant just kidding around. As a result, defendant paid little attention to the allegations regarding Gypsy.

Immediately after reading the letter, defendant told Sadie to ask their children if he had done anything to them. Sadie asked the children and they denied any such thing had happened. Defendant angrily left the house and drove to the mountains to confront Karl and Karen about the allegations. As defendant neared the O. house, he saw Karl, Karen, and their children,

---

[2] Sandra first testified Gypsy told her in the summer of 1983. However, a few moments later she testified Gypsy told her about the molestations in December 1983.

including Gypsy, parked in front of the Bass Fork Mini Mart. Defendant pulled over and parked next to them. Karl got out of his car and came over to talk.

According to defendant, he confronted Karl and asked him why Karen and Gypsy's psychiatrist were accusing him of molesting his own daughters. Defendant said neither he nor Karl mentioned Gypsy nor any accusations about her. Defendant said at the time he was not even concerned about Gypsy. Rather, his sole concern was the accusations about his own daughters. Defendant said the conversation lasted about 10 minutes and although he was angry he was not crying. He said Karl told him a number of times he belonged in jail. However, defendant denied making a similar statement. Defendant also denied telling Karl he should have said something about the misconduct years before.

According to Karl, defendant appeared to be crying when he approached. Defendant said he was sorry for what he had done to Gypsy and he should have told Karl about the situation five years earlier. Karl told defendant he needed help but defendant said "maybe jail is where he belonged." Karl said defendant also wondered how long he would have to go to counseling. Gypsy testified she saw defendant and her stepfather talking but did not hear their conversation. She said her stepfather had a "bad look" on his face and it appeared defendant was crying.

In July 1986, a few weeks after the mini mart confrontation, counselor Nancy LeBlank arranged for Gypsy to talk to a deputy sheriff about her allegations. As a result, defendant was charged with a variety of sexual offenses.

Gypsy testified at trial that she was 11 years old and enrolled in the sixth grade. She spent the summers from 1982 through 1984 living with her grandparents in North Fork.[3] Gypsy testified defendant sometimes babysat her during those summers, usually when her grandmother was running some errand. On those occasions, defendant also took care of his three children, the oldest of whom was a year younger than Gypsy.

Gypsy began her trial testimony by describing an act of sexual intercourse which allegedly occurred during the summer of 1984 when she was eight years old. Gypsy testified one day at her grandmother's house the defendant was babysitting her and her cousins. Defendant came into the

---

[3] Gypsy's grandparents, Gene and Morana, her aunts, June and Sadie, and her uncle, the defendant, testified her visits to North Fork were intermittent. They said Gypsy visited her grandparents during those summers only occasionally and then only for a day or two at a time. The visits occurred mostly on weekends.

house and told her cousins to go out and play. He then told Gypsy to take off her clothes and get onto the bed in the living room. Gypsy did as defendant told her. Defendant then took off his clothes, got on top of her, put his penis in her vagina and moved it up and down. Gypsy said it hurt when defendant inserted his penis. Gypsy said it hurt when defendant had intercourse with her but she never told him it hurt. She said she always did what defendant told her to do because she was afraid to refuse. However, Gypsy said she did not know what she feared. She said defendant never told her not to tell anyone, nor did he ever say he would hurt her if she did.

Gypsy also described another incident which allegedly occurred during the summer of 1984. She said one day defendant took her and her cousins swimming at a nearby creek. While they were at the creek, defendant left his own children by the swimming hole and took Gypsy to a sandy place behind some large rocks. Defendant and Gypsy were about 16 feet from the other children, who were playing on the other side of the rocks. Defendant told Gypsy to take off her clothes and lie down. Gypsy did as she was told. Defendant took off his pants, got on top of her, and placed his penis in her vagina. Gypsy said she complied with defendant's directions at the creek because she was afraid he might do something to her or her parents if she refused.

In addition to these two incidents, Gypsy said defendant had intercourse with her "a lot" during the summer of 1984. She did not state the specific number of acts but did say intercourse occurred more than three times. Gypsy said with the exception of the single incident at the creek, the acts always took place on the living room bed at her grandmother's house. On each occasion, defendant would be babysitting and would tell the other children to go out and play.

In addition to the 1984 incidents, Gypsy said defendant had intercourse with her more than three times in 1983 and more than three times in 1982. Gypsy said all the acts occurred on the living room bed at her grandmother's house while her cousins were playing outside.

Gypsy testified defendant's first act of sexual misconduct occurred in the summer of 1981 when she was five or six years old and between kindergarten and the first grade. She said defendant sent her inside her grandmother's house and told her cousins to stay outside. Defendant then closed and locked the door. He told her to take off her clothes and to lie on the bed in the living room. Gypsy did as she was told and defendant stuck his penis in her anus. Gypsy said she obeyed defendant because she was scared. However, defendant did not threaten her in any way. Gypsy did not know whether defendant looked mean or anything.

Gypsy said on at least four occasions after intercourse, she noticed blood spots in her panties when she went to the bathroom. She said there would be about three or four such spots and they were always small, about half the size of her little fingernail. Gypsy said she first noticed such spots in the summer of 1982, after defendant had placed his penis in her vagina. Gypsy said no one ever saw the blood spots in her panties because she usually did her own laundry.

According to Gypsy, defendant placed his penis in her anus on a number of occasions. She said he did so at times other than when he placed his penis in her vagina. Gypsy said those acts also occurred on the living room bed at her grandmother's house. She said it hurt when Jeff placed his penis in her anus and he did it "a lot," more than three times in 1984, more than three times in 1983, and more than three times in 1982.

In addition, Gypsy testified defendant placed his penis in her mouth. She said those acts also occurred on the living room bed at her grandmother's house. She said when defendant placed his penis in her mouth he told her to suck on it as if it were a popsicle. She said she was unhappy about doing it but was afraid to refuse. Gypsy testified she did not know how many times defendant placed his penis in her mouth. However, he did it more than once in 1984, more than once in 1983, and more than once in 1982. Gypsy said nothing came out of defendant's penis during those incidents or any of the other sexual acts with defendant.

Gypsy said all of the incidents happened between June and August in 1982, 1983 and 1984, but she could not recall exactly when the various incidents occurred during those respective summers. Gypsy also testified defendant sometimes told her he would give her candy if she did what he asked. He gave her the candy after the incidents but did not give any to the other children. She said the first time he offered her candy was in 1982. Although Gypsy received the candy, that was not why she complied with defendant's directions.

On cross-examination, Gypsy said defendant used Vaseline but did not remember when or how many times. She admitted she never mentioned the use of lubricants to anyone prior to testifying at trial.

Gypsy said she hated defendant but did not know when her hatred developed. She knew her stepfather, Karl, and defendant once had a fistfight but she insisted her hatred began before that event. She admitted, however, the fight occurred before she first told her mother about defendant's misconduct.

At trial, Gypsy also accused her grandfather of having molested her in 1981, between kindergarten and first grade. She initially said her grandfather molested her only once and then she said he did it twice. She said the first incident occurred one day after school. Her grandfather placed his hand in her panties and started rubbing. The second incident occurred one morning when she was in bed with her grandparents. Gypsy's grandmother got out of bed to fix breakfast and Gypsy stayed in bed with her grandfather. She was just lying there when her grandfather started rubbing her. Gypsy told her parents about the incidents in the summer of 1986. Gypsy's grandfather, Gene, denied the accusations at trial and said he had only just learned of them.

Gypsy's stepsister, Sandra O., testified in 1983 Gypsy told her defendant had engaged in sexual intercourse with her. According to Sandra, Gypsy said the acts occurred at her grandmother's house and at the creek. Sandra testified Gypsy said she had been molested at the creek several times. Gypsy never told Sandra how many times she was molested altogether, just that it happened several times. Gypsy told Sandra the molestations occurred mostly during the summer between the time she was four and eight years old.

Dr. Joan Voris, M.D., examined Gypsy on November 10, 1986. She found Gypsy's hymen was intact but contained two small, well-healed scars. The first scar could be seen by the human eye and was located on one side of the hymen. The other scar could only be seen by using the higher power on the doctor's colposcope.[4] The second scar was located at the bottom of the hymen and was approximately one millimeter wide and two millimeters long. Dr. Voris testified repeated sexual intercourse in the average eight year old would produce much more damage to the hymen. However, the doctor also testified young children sometimes describe a penis as having gone inside them when in fact the penis has only penetrated the lips of the labia. The scarring on Gypsy's hymen was consistent with such minimal penetration but not with full penetration of the vagina.

Dr. Voris also examined the area where the hymen joins the labia, called the posterior fourchette. Dr. Voris explained when repeated unsuccessful attempts have been made to insert a penis into a vagina, the penis often slides off and rubs across the posterior fourchette, leaving scars in the area. The doctor said if there had been repeated penetration of Gypsy's labia lips without actual penetration of the hymen, she would expect such scarring on Gypsy's posterior fourchette. Although Dr. Voris found no such scarring, she testified the use of a lubricant could prevent damage to the posterior

[4] A colposcope is an instrument inserted into the vagina for examination of the tissues of the vagina and cervix by means of a magnifying lens. (Dorland's Illustrated Medical Dict. (26th ed. 1981) p. 291.)

fourchette. Finally, Dr. Voris examined Gypsy's rectal area and found it normal. There were no scars, lacerations or other indications of sexual abuse.

Susan Holland, a licensed clinical social worker who works with molested children, testified over defense objection. On November 10, 1986, Holland interviewed Gypsy at the request of the district attorney. Holland and Gypsy talked together for about an hour and a half. They discussed Gypsy's feelings about herself, her feelings about the alleged molestations, and her reactions to the court proceedings.

Holland said Gypsy described some of the molestation incidents to her. Holland also said Gypsy was tearful several times, particularly when she described her grandmother's reaction to her disclosure. According to Holland, Gypsy was angry because she felt her grandmother did not believe her. The only time Gypsy expressed anger was when she talked about the negative feelings she got from her grandmother.

Holland said Gypsy was also tearful when she described several nightmares she had about the incidents. In one nightmare, she dreamed defendant kidnapped her and she tried to run away. In the other nightmare, she dreamed defendant was trying to kill her. Gypsy told Holland the dreams were recurrent although she stopped having them so often after she disclosed the molestations. Gypsy also expressed feelings of depression and sadness when she thought about what happened between her and her uncle.

Holland asked Gypsy whether defendant told her to keep the incidents a secret. Gypsy said no, but she feared something would happen to her stepfather and mother if she told. During the molestation incidents she feared something would happen to her stepfather and mother.

Finally, Holland testified Gypsy's self-esteem was good during the interview and she seemed fairly well adjusted to the incidents.

Mary Meyers, a clinical psychologist who specializes in sexual assault cases, testified immediately after Holland, also over defense objection. According to Meyers, there are a number of reasons why young victims fail to disclose acts of molestation. The victims fear they or someone else will be hurt by the perpetrator, they will not be believed, or they will be blamed for having done something bad. Meyers said the abuser does not always have to threaten the young victims. Children simply sense they or someone else will be hurt by the person doing the molesting. Meyers also testified children simply accept molestation when it occurs repeatedly over a long period of time.

Meyers said research indicates most child victims have nightmares in which they are hurt or killed. She added it is unusual for the actual perpetrator to be in such dreams. Meyers said counseling can relieve symptoms of molestation; the literature on the subject suggests one aspect of recovery is based on the child feeling accepted and believed. Meyers said recovery depends more on dealing with the situation than on the number of incidents or length of time over which the molestations occurred. She also said it is not unusual for the child to hate the perpetrator in molestation cases.

### DEFENSE

Defendant testified on his own behalf and denied molesting Gypsy or telling her stepfather he had molested her. Defendant said Gypsy was a happy-go-lucky child who had never been afraid of him. He never noticed her looking unhappy, not even after she moved to Madera. He could not think of any reason why she would make up such accusations because he had never mistreated her. Defendant admitted taking care of Gypsy but said he was never alone with her during the summers of 1981, 1982, 1983, or 1984. He said one or more of the other adults—his wife, her sister June, and the grandparents—were always around. With respect to candy, defendant said he often brought it home for all of the children—his own and Gypsy.

Defendant said he had taken Gypsy and his own children to the swimming hole Gypsy described but denied molesting her. He pointed out in 1984 two of his children were under age six, the water was too deep for them, and they did not know how to swim. Defendant said he had to stay and watch his children the entire time they were at the creek. Defendant admitted there was a large rock at the swimming hole and two people could lie behind it without being visible to people on the other side.

Karl O. testified he and defendant worked together in Karl's cement finishing business. Defendant worked for Karl for many years and they had been best friends at one time. Defendant said he and Karl had gotten into a fight some years earlier, around 1983. He said the fight was minor but had left some "bad blood" between them.

Defendant's wife, Sadie, said her husband never took care of Gypsy. Defendant never went to the C.'s home except with Sadie.

Rhonda, defendant's 10-year-old daughter, said her father babysat Gypsy. She said he once took Gypsy and the other children to the swimming hole but she denied he took Gypsy away from the others. Defendant told

the children Gypsy was trying to put him in jail. That made Rhonda angry and she said she did not want him to go.

Morana C., Gypsy's grandmother and defendant's mother-in-law, testified Gypsy did not visit her home during the summers of 1982 or 1983. She said defendant cared for Gypsy and his children but he was never alone with them. Morana did not believe Gypsy's accusations. When Gypsy's mother, Karen, was 16 or 17 she told Morana she had been raped by her uncle. Counsel stipulated Morana did not believe the accusations of molestation.

Gene C., Morana's husband and Gypsy's grandfather, testified Gypsy visited his home "a few times" after 1981. He said defendant treated Gypsy the same as he treated his own children. According to Gene C., the families gathered for Christmas at the C.'s home in 1985 and Gypsy attended. She did not act fearful around men at that time.

## DISCUSSION

### I.

### SHOULD THE NINE COUNTS OF RAPE BY FEAR BE REVERSED BECAUSE THERE WAS NO EVIDENCE OF THREATS MADE TO THE VICTIM?

 Defendant contends there was insufficient evidence to convict him of the nine counts of rape because there was no evidence of threats made to the victim.

At the time the information was filed, section 261 stated in relevant part: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances:

". . . . . . . . . . . . . . . . . .

"(2) Where it is accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another. . . ."

In counts I, II, III, XII, XIII, XIV, XXIII, XXIV, and XXV, the district attorney charged defendant with rape as follows:

". . . That DARRELL WILFRED JEFF, did, . . . in the County of Madera, State of California, commit a FELONY, namely, violation of Sec-

tion 261(2) of the Penal Code of the State of California, in that the said defendant(s) did willfully and unlawfully have and accomplish an act of sexual intercourse with a person, to wit, [Gypsy], not his spouse, against said person's will by means of force and fear of immediate and unlawful bodily injury on said person and another." Thus, the information charged defendant with the commission of rape by "force or fear." The clerk of the court read the charges to the jury at the beginning of trial.

The prosecution did not elicit evidence of force during trial and the trial court struck all references to force when it prepared its instructions to the jury. When the trial court addressed the jury on the elements of rape, it limited its instructions to the element of fear:

"Defendant is charged with rape, a violation of Section 261(2) of the Penal Code.

"The crime of rape as charged against the defendant in this case is also an act of sexual intercourse with a person who is not the spouse of the perpetrator, accomplished against such person's will by means of fear of immediate and unlawful bodily injury to such person or to the mother and father.

"In order to prove the commission of the crime of rape, each of the following elements must be proved: 1) That the defendant engaged in an act of sexual intercourse with a person, 2) That such other person was not the spouse of the perpetrator, 3) That the act of intercourse was against the will of such other person, and 4) That such act was accomplished by means of fear of immediate and unlawful bodily injury to such person or to the mother and father."

Defendant contends on appeal: "Gypsy . . . said that the first time Jeff ever did anything to her was in 1981. (Jeff was not charged with any acts alleged to have occurred in 1981.) She said that she did what Jeff told her on that first occasion because she was afraid not to. But she said that Jeff had not threatened her in any way. . . . When asked specifically whether Jeff had looked mean or anything on that occasion, she replied that she did not know. . . .

"Thus, despite Gypsy's testimony that she submitted out of fear, no evidence was elicited that a threat of any kind, let alone a threat of immediate bodily harm, was ever made. Nor did Gypsy testify that anything was ever said or done that might induce a fear of immediate and unlawful bodily injury. Finally, there is no evidence that Gyspy ever conveyed by word or deed her fear that she might be harmed if she did not submit to the acts of intercourse. Given such a total absence of evidence 'the jury could not

reasonably have concluded that [appellant] committed a rape by means of fear of immediate and unlawful bodily injury.' (*People* v. *Young* [(1987)] 190 Cal.App.3d 248, 259 [235 Cal.Rptr. 361].)"

 When the sufficiency of the evidence is challenged, a reviewing court must examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which the jury could find defendant guilty beyond a reasonable doubt. Substantial evidence must support each essential element of an offense. A judgment of conviction will not be set aside for insufficiency of the evidence to support the jury's verdict unless it is clearly shown there is no basis on which the evidence can support the conclusion of the jury. The credibility of witnesses and the weight to be accorded to the evidence are matters to be determined by the trier of fact. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576-577 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; Evid. Code, § 312.)

Until its amendment in 1980, former section 261, subdivisions 2 and 3 defined rape as an act of sexual intercourse under circumstances where the person resists, but where " 'resistance is overcome by force or violence' " or where " 'a person is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution . . . .' " (*People* v. *Barnes* (1986) 42 Cal.3d 284, 292 [228 Cal.Rptr. 228, 721 P.2d 110].) As amended in 1980, section 261, subdivision (2) makes criminal any act of sexual intercourse accomplished with a person not the spouse of the perpetrator where it is accomplished against the person's will by means of force or fear of immediate and unlawful bodily injury on the victim or another. The amended section deletes earlier provisions relating to the element of resistance connected with force, violence or threats. (*People* v. *Montero* (1986) 185 Cal.App.3d 415, 424 [229 Cal.Rptr. 750].) Only in subdivision (6) of the section is "threat" a factor, and then it applies to threats of retaliation in the future.

 By eliminating the resistance requirement, the Legislature clearly intended to change prior law with regard to the use of force in rape. No such intent appears with regard to the fear element. In this respect, it is not enough for the prosecution to show sexual intercourse was accomplished against the will of the victim by means of fear. There is a further requirement the victim fear "immediate and unlawful bodily injury." However, even an unreasonable fear may suffice " 'if the accused knowingly takes advantage of that fear in order to accomplish sexual intercourse.' " (*People*

v. *Young, supra,* 190 Cal.App.3d 248, 259, quoting *People* v. *Barnes, supra,* 42 Cal.3d at p. 304, fn. 20.) Rape may also be committed by acts causing only fear of immediate bodily harm to the victim or another and no longer requires threats of imminent harm. Fear generally has two common meanings: (1) a feeling of alarm or disquiet caused by the expectation of danger, pain, disaster, or the like; terror; dread; apprehension and (2) extreme reverence or awe, as toward a supreme power. (*People* v. *Montero, supra,* 185 Cal.App.3d 415, 424-425, citing American Heritage Dict. (1981) p. 480.)

Defendant contends this court's decision in *People* v. *Young, supra,* 190 Cal.App.3d 248 compels reversal here. In *Young,* defendant was convicted by jury of lewd and lascivious conduct with a child under age 14, oral copulation with a child under age 14 and more than 10 years younger than defendant, and forcible rape (§ 261, subd. (2)). The jury further found the defendant engaged in substantial sexual conduct while occupying a special position of trust and carnally abused a female under age 10. The victim in *Young* lived in Madera with her younger brother, her stepsister, her stepmother, and her 26-year-old father, the defendant. Defendant was home alone with the children at the house while the stepmother was at work. The defendant called the victim into his bedroom and told her to come to the bed and get on it. He then told her to get under the covers. He put the victim on top of him, pulled her pants down, and had her slide down to his "private place" which she felt as she slid down. Defendant touched her vagina with his finger and his penis. When he put his finger into her vagina it hurt. When he put his penis into her vagina it did not feel good. The victim testified it "felt like water kinda" and when defendant stopped, the victim went to the bathroom to wipe herself off. The victim did not want defendant to place his penis in her vagina but she did not tell him because she was "too scared." The victim was afraid of the defendant and afraid he would do something to her such as touching her on her private place again. However, defendant did not say anything to the victim that made her afraid. Defendant challenged the sufficiency of the evidence to support his conviction of rape and this court reversed the judgment of conviction on that count.

We held the victim's testimony provided substantial evidence to show defendant accomplished an act of sexual intercourse by means of force and against her will. Under the evidence, the jury could properly conclude the victim had capacity to exercise free will and had knowledge of the nature of the act. This was especially true since she had a prior sexual experience with her cousin. The jury could also properly find the act of sexual intercourse was against the victim's will since she did not want to do it and the evidence did not otherwise establish positive cooperation in act or attitude. Finally,

some force was used by the defendant in both the penetration and the physical movement and positioning of the victim in accomplishing the act.

However, we further concluded there was no substantial evidence that defendant accomplished the act of sexual intercourse by means of fear of immediate and unlawful bodily injury. There was no evidence of a threat or prior threat of bodily harm such as a spanking. Moreover, defendant did not do or say anything that could induce fear of immediate and unlawful bodily injury. Nor did the victim ever state or otherwise indicate to the defendant she was scared of such injury. Therefore, the jury could not reasonably have concluded defendant committed a rape by means of fear of immediate and unlawful bodily injury. We reversed defendant's conviction because we were unable to state with any degree of certainty which theory—either force or fear—the jury may have used to find the defendant guilty of rape.

In reversing Young's rape conviction, we distinguished our earlier opinion in *People* v. *Jones* (1984) 155 Cal.App.3d 153, 168-169 [202 Cal.Rptr. 162]. In *Jones,* defendant was convicted on multiple counts of rape by threat of great bodily injury. Defendant lived with a woman who had four female children. The victims were three of these children and one of their friends. There was no evidence defendant made any specific threats with respect to those counts for which he was convicted of rape by threat of great and immediate bodily harm. However, there was evidence he had engaged in a pattern of exploitative sexual conduct with the victims over a period of nine years. During that time, he had punished them by spanking and slapping them. We affirmed the convictions in a majority opinion. The majority found substantial evidence to support defendant's conviction on the rape counts despite the absence of any testimony relating to force or threats. The court held a threat may be inferred from conduct. The evidence was sufficient to support the convictions in *Jones* in light of the victims' young ages, the position of authority held by defendant for a period of nine years, the uselessness of resistance, the deeply embedded and conditioned fear of retribution, the natural submission to the authority of the parent which contributed to the victims' vulnerability, and their perception of defendant's conduct as an implied threat of immediate and great bodily harm if they were to resist. Unlike the *Jones* case, there was no evidence of a threat or a prior threat of bodily harm such as a spanking in *Young.* Moreover, Young did not do or say anything that could induce fear of immediate and unlawful bodily injury. Nor did the victim in *Young* ever state or otherwise indicate to the defendant she was scared of such injury. Therefore, as previously stated, the jury could not reasonably have concluded defendant committed a rape by means of immediate and unlawful bodily injury.

In the instant case, Gypsy testified defendant committed numerous acts of sexual intercourse, oral copulation, and sodomy with her during the summers of 1982, 1983 and 1984 when she was six to eight years old. Nine counts of rape were based upon this testimony. With the exception of one act of intercourse which allegedly took place at the creek, Gypsy testified the acts all occurred at her grandparents' house at various times during the three summers. Gypsy said the acts occurred while defendant was watching her when the other adults in the household were absent.

As to the rape counts, Gypsy testified defendant would tell the other children present to play outside. He would then take her inside the house and tell her to take off her clothes and get on the bed in the living room. After she complied, defendant would undress, get on top of her, put his penis in her vagina and move it up and down. Although it hurt when defendant placed his penis inside her, she never told him so.

Gypsy testified she always did what the defendant told her to do because she was scared. She said she was afraid defendant might hurt her or do something to her parents if she did not comply. However, she had no idea what he might do. She said defendant never told her not to tell anyone about the incidents and the defendant never said he would hurt her if she told anyone.

Gypsy's testimony about the creek incident was similar to her testimony about the incidents at the house. She said when they were at the creek her uncle took her behind a big rock and told her to undress and lie down. He then got on top of her and placed his penis in her vagina. Gypsy said she did as defendant told her because she was afraid he might hurt her or her parents if she did not comply. However, she also testified defendant never threatened to hurt her parents and she did not know where she got that idea. Gypsy also said the first time defendant ever did anything to her was in 1981. She said she complied with defendant on that occasion because she was afraid not to. However, she said defendant had not threatened her in any way. When specifically asked whether defendant had looked mean or anything on that occasion, she replied she did not know.

The People acknowledge this evidence is insufficient to support a conviction of rape by threat in light of the opinion in *Young*: "It appears this Court requires express statements of harm or menace to the child, or evidence that the child victim was the victim of, or the witness to, one or more acts of violence committed by the molester before it will sustain a rape conviction on this theory. While respondent concedes that there is no evidence of express statements of harm or acts of violence in this case,

respondent hopes to demonstrate why this type of evidence is not essential, and, consequently, why this court should reconsider its holding in *Young*."

The People rely on *People* v. *Jones, supra,* 155 Cal.App.3d 153 to establish the reasonableness of the victim's fear in the instant case.

In *Jones,* defendant was convicted on multiple counts of rape by threat of great and immediate bodily harm. While there was no evidence defendant made any specific threats at the time of the actual commission of the acts of intercourse with the various victims, the evidence reflected (1) the defendant had first sexually assaulted the girls when they were very young, using physical force and overcoming their physical resistance in accomplishing the acts, and (2) the sexual abuse continued for many years during which time defendant continued to intimidate them, punish them with slapping, spanking, and using a "switch" on them, whenever he, defendant, felt it appropriate to do so.

This court, in its majority opinion, concluded in *Young* there was substantial evidence to support Jones's convictions on the rape counts despite the absence of testimony relating to force or threats. We said, referring to the *Jones* opinion: "The court held that a threat may be inferred from conduct, and, under all the circumstances (the victims' young ages, together with the position of authority held by defendant for a period of nine years, the uselessness of resistance, the deeply embedded and conditioned fear of punishment and retribution, the natural submission to the authority of the parent which contributed to the victims' vulnerability, and their perception of defendant's conduct as an implied threat of immediate and great bodily harm if they were to resist), the evidence was sufficient to support the convictions. (*People* v. *Jones, supra,* 155 Cal.App.3d 153, 172-173, 174, 177.)" (*People* v. *Young, supra,* 190 Cal.App.3d 248, 257.)

Both the instant case and *Young* are distinguishable from *Jones.* Here, the prosecution argued only that defendant accomplished the acts of intercourse with Gypsy by means of fear of immediate and unlawful injury to her or to her mother and stepfather. All references to "force" were stricken by the trial court from the instructions read to the jury. Upon the evidence, the jury could reasonably conclude that the acts of sexual intercourse were against Gypsy's will since she did not want the defendant to do these things to her and, as in *Young,* some force was used by defendant in the penetration and physical movement involved and, at least in the beginning, it was painful for her.

However, here, as in *Young,* we must conclude there is no substantial evidence that defendant accomplished the acts of sexual intercourse by

means of fear of immediate and unlawful bodily injury. The defendant was Gypsy's uncle, not her father or stepfather. Gypsy did not live with defendant and he certainly did not exercise the dominion and control over her and her acts and conduct as was the case in *Jones* and in *Young*. Defendant never threatened Gypsy, never punished her, i.e., slapped or spanked her, never told Gypsy he would hurt her if she did not comply with his sexual demands and never told her not to tell. While Gypsy said she was afraid to refuse defendant these sexual demands, she did not know, or at least could not articulate, what it was she feared. And, unlike *Jones,* there was no history of acts and conduct by defendant toward Gypsy such as slapping, spanking, and other punishments, to dominate and control her. In sum, there is simply no evidence in this record from which the jury could have reasonably concluded that defendant committed any rape of Gypsy by means of fear of immediate and unlawful bodily injury. Of course, this does not mean defendant's conduct, as described by Gypsy, was lawful or to be condoned and go unpunished. Such conduct does constitute a violation of section 288, subdivision (a), lewd and lascivious conduct with a child under age 14, whether accomplished by force or fear or not. However, such conduct is not rape as defined in section 261, subdivision (2) and interpreted and construed by this appellate district. Thus, defendant's convictions of rape on counts I, II, III, XII, XIII, XIV, XXIII, XXIV and XXV must be reversed. We must further note any further proceedings on the *rape* counts are barred by the double jeopardy clause. (*People* v. *Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468].)

II.

### Did the Trial Court Erroneously Permit Introduction of Gypsy's Postmolestation Behavior and Statements to Prove the Alleged Molestations Actually Occurred?

Defendant next contends the trial court erroneously permitted the prosecution to introduce the victim's postmolestation behavior and statements to prove the alleged molestations actually occurred. He argues the testimony of two expert witnesses describing and explaining Gypsy's emotional state after the alleged molestations was improper for the following reasons: (1) the evidence was offered to prove the molestations in fact occurred; (2) in introducing evidence of Gypsy's postmolestation behavior and statements, the prosecution unnecessarily relied on an expert witness when a nonexpert, Gypsy herself, could have provided the same testimony; (3) most of the testimony regarding Gypsy's postmolestation behavior and statements was improper hearsay; (4) the evidence offered to explain the significance of Gypsy's postmolestation statements and behavior was mostly irrelevant but nevertheless lent the prosecution case an unwarranted aura of

scientific authenticity; and (5) the prosecution improperly sought to avoid the proscription against having an expert witness rely on the facts of the case to explain trauma by using two experts, one to present the facts of this case and the second to explain the significance of those facts.

The *Kelly-Frye* test[5] conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed. (*People* v. *Shirley* (1982) 31 Cal.3d 18, 34 [181 Cal.Rptr. 243, 641 P.2d 775], cert. den. 458 U.S. 1125 [73 L.Ed.2d 1400, 103 S.Ct. 13].) The proponent must establish reliability of method and proper qualifications of the testifying witness. (*People* v. *Roehler* (1985) 167 Cal.App.3d 353, 388 [213 Cal.Rptr. 353], cert. den. 474 U.S. 1021 [88 L.Ed.2d 556, 106 S.Ct. 571].) A single witness is insufficient to represent the views of an entire scientific community regarding reliability of the technique. (*People* v. *Kelly, supra,* 17 Cal.3d 24, 37.) Those techniques are not necessarily limited to manipulation of physical evidence but also include new scientific processes operating on purely psychological evidence. The purpose of the standard is to prevent the jury from being misled by unproven and ultimately unsound scientific methods. (*People* v. *Shirley, supra,* 31 Cal.3d 18, 53; *People* v. *Gray* (1986) 187 Cal.App.3d 213, 218-219 [231 Cal.Rptr. 658].)

In *People* v. *Jackson* (1971) 18 Cal.App.3d 504 [95 Cal.Rptr. 919], the Fourth District Court of Appeal approved the use of expert medical testimony concerning the battered child syndrome. The syndrome indicates a child with specific types of injuries did not receive them by accidental means. The testifying doctor commented these injuries are typically inflicted by someone ostensibly caring for the child. However, he did not give any opinion as to who might have been responsible for the particular injuries. In ruling the syndrome evidence admissible, the court noted this subject had been extensively studied by medical science and the battered child syndrome had become an accepted medical diagnosis.

In *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291], the California Supreme Court addressed the admissibility of evidence concerning the rape trauma syndrome. A rape counselor testifying for the prosecution described the syndrome as an acute stress reaction to trauma and explained three psychological phases of the syndrome, i.e., disorientation, reorganization, and integration. The counselor concluded the victim in *Bledsoe* suffered from rape trauma syndrome. On appeal, defendant con-

---

[5] *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013 [54 App.D.C. 46, 34 A.L.R. 145]; *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].

tended evidence of a rape trauma syndrome was inadmissible because it did not meet the *Kelly-Frye* standard of reliability for new scientific methods of proof. The Supreme Court agreed but concluded the error was not prejudicial because of the strong prosecution case. The court noted the syndrome behavior was not introduced to rebut a defense argument the victim's behavior was inconsistent with a claim of rape. Rather, the evidence was introduced to prove the rape had in fact occurred. The court rejected the prosecution's argument that this use was proper as in the battered child syndrome cases. The court found the rape trauma syndrome was devised as a therapeutic treatment tool, not as a means of determining whether a rape actually occurred. Because of the purpose and nature of the rape trauma syndrome, the court concluded syndrome evidence was inadmissible to prove the victim was raped.

This court has discussed the child molest syndrome in two cases. In *People* v. *Willoughby* (1985) 164 Cal.App.3d 1054 [210 Cal.Rptr. 880], the court in one sentence concluded testimony of a sexual trauma expert was inadmissible on the subject of the victim's truthfulness. (*Id.* at p. 1069.) In *People* v. *Roscoe* (1985) 168 Cal.App.3d 1093 [215 Cal.Rptr. 45], the court stated: "[In *People* v. *Bledsoe* (1984) 36 Cal.3d 236,] [t]he prosecution called as an expert the rape counselor, who had assisted the 14-year-old victim, to testify that she suffered from rape trauma crisis syndrome. Such testimony was held inadmissible to prove that a rape had occurred, although the court noted that expert testimony on aftereffects of rape 'may be admitted for a variety of purposes.' (*People* v. *Bledsoe, supra,* 36 Cal.3d at p. 238.)

". . . . . . . . . . . . . . . . . . .

"Credibility questions arise whenever the defendant denies the victim's story, explicitly or implicitly suggesting misrecollection or fabrication. If, in every such case, the jury could be informed that a doctor had diagnosed the complainant, based upon the specific facts in the case, as a child molest victim (or rape victim, or whatever), then the protection against misuse of psychologists' testimony erected by *Bledsoe* would be largely dismantled.

"Where the expert refers to specific events, people, and personalities and bases his opinion as to credibility on his diagnosis of *this* witness, then the conclusion that the witness is credible rests upon the premise that the diagnosis is accurate, and that in fact molestation had occurred. The jury in effect is being asked to believe the diagnosis, to agree that the doctor's analysis is correct and that the defendant is guilty. Such a result would subvert the sound rule adopted by a unanimous Supreme Court in *Bledsoe.* It follows, therefore, that the expert testimony authorized by *Bledsoe* to permit rehabilitation of a complainant's credibility is limited to discussion

of victims as a class, supported by references to literature and experience (such as an expert normally relies upon) and does not extend to discussion and diagnosis of the witness in the case at hand." (*Id.* at pp. 1097-1100, fns. omitted.)

In *People* v. *Gray* (1986) 187 Cal.App.3d 213 [231 Cal.Rptr. 658], defendant was charged with lewd conduct upon a child under the age of 14 (§ 288, subd. (a)). The charge was based on statements by his nine-year-old stepdaughter to her stepmother and to the police. The alleged victim had initially been reticent to disclose the alleged incidents and her accounts were somewhat inconsistent. An expert witness for the prosecution testified such reticence and inconsistencies were typical of young child abuse victims. Defendant was convicted and the Second District Court of Appeal affirmed. The expert's testimony was not admitted as a means of proving a molestation had in fact occurred from the alleged victim's postincident trauma. The evidence was admitted after the victim testified she did not tell anyone about touching defendant's penis except in response to a detective's questioning. Until the victim testified in court, she did not tell anyone the defendant had said, "It won't bite you." She told her mother she might have been incorrect about some incidents but agreed with her father because she feared his anger. The expert said delayed reporting and inconsistency are not unusual with victims of child molestation and the defense expert concurred in that statement. In *Bledsoe* and other cases discussing the rape trauma syndrome, the diagnosis was used to prove a rape had occurred. Thus, subjecting rape trauma syndrome to *Kelly-Frye* parameters made sense. In *Gray,* the evidence was not introduced and did not purport to prove molestation had occurred. Rather, it was admissible as bona fide rebuttal, such as testimony based on general literature or experience as to the reluctance of molest victims, as a class, to talk to investigators or discuss the intimate details of the incidents.

In *In re Sara M.* (1987) 194 Cal.App.3d 585 [239 Cal.Rptr. 605], the minor was adjudged a dependent of the Sacramento County Juvenile Court and placed in the custody of her maternal grandfather. The juvenile court sustained a dependency petition (Welf. & Inst. Code, § 300, subd. (d)) alleging (1) minor's stepfather performed lewd and lascivious acts upon her while she was in the care of her mother and (2) minor had no parent capable of exercising proper and effective parental care or control. Among petitioner's numerous witnesses at the jurisdictional hearing were two psychologists who testified concerning the child molest syndrome. The trial court permitted the witnesses to describe the syndrome but did not allow those witnesses to testify a molestation had in fact occurred. Minor's mother contended the trial court prejudicially erred in allowing testimony concerning the syndrome to prove minor had been molested. The Third Dis-

trict Court of Appeal agreed and reversed the judgment. One of the clinical psychologists who treated minor testified she had diagnosed minor as suffering from a posttraumatic stress disorder. The psychologist testified victims of child molestation exhibit certain common characteristics, including consistency in recounting the molestation, denial the molestation occurred, unusual sexual knowledge, ability to recall the molestation, and a feeling of loss of control over the victim's life. The second clinical psychologist who had treated minor elaborated on symptoms of the child molest syndrome. The juvenile court allowed numerous witnesses, including these psychologists, to testify about minor's behavior and statements to demonstrate the existence of symptoms associated with the child molest syndrome.

The Third District concluded the evidence adduced at the jurisdictional hearing failed to meet the *Kelly-Frye* standard. The psychologists testified the syndrome is neither included in the Diagnostic and Statistical Manual of Mental Disorders (DSM-III) of the American Psychiatric Association nor recognized by the American Psychological Association or other professional organizations. The psychologists described the syndrome as being in the beginning stages of development and acceptance. No treatises on the syndrome were introduced into evidence. A basic defect of the syndrome was apparent to the reviewing court. The syndrome was developed on the assumption the children studied were in fact molested. While no one at the hearing testified directly concerning the reason for the syndrome's development, it appeared to be a tool for therapy and treatment, much like the rape trauma syndrome. Consequently, the same problem discussed in *Bledsoe* would seem to be present in the case of the child molest syndrome. In other words, if the syndrome was not developed as a truth-seeking procedure but rather as a therapeutic aid, it cannot be used for a different purpose, i.e., to prove a molestation occurred.

■■ ■■ ■■ ■■ On January 4, 1988, the superior court filed a settled statement on appeal in the instant case, stating in relevant part: "On December 17, 1986, during the trial of Darrell Wilfred Jeff in Superior Court case number 6971, an unreported proceeding was held in chambers. During that proceeding the prosecution and defense attorneys sought a ruling on the admissibility of the testimony of two prosecution witnesses.

"Those witnesses were Susan Holland, a licensed clinical social worker, and Mary Beth Meyers, a registered psychologist. The prosecutor, Mr. Paul Avent, sought through Ms. Holland's testimony to establish that the complaining victim in the case, [Gypsy], exhibited certain symptoms commonly found in child molest victims. The prosecutor sought through Ms. Meyers' testimony to explain to the jury the nature of the symptoms commonly

exhibited by children suffering from post child molest traumatic stress syndrome.

"Defense counsel, Mr. Lester J. Gendron, sought to exclude the testimony of both witnesses on the ground that their testimony would be prejudicial to defendant, and on the further ground that their testimony would 'invade the province of the jury.'

"Relying on *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291] and *Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471 [184 Cal.Rptr. 787], this Court ruled that the testimony of both witnesses would be admissible with respect to the symptoms exhibited by the complaining victim, but that neither witness would be allowed to state their opinion regarding whether a molestation had, in fact, occurred.

"Following the hearing in chambers, defense counsel partially renewed his motion on the record, asking that Ms. Holland not be allowed to state any conclusions, and that Ms. Meyers not be allowed to testify. While this court did not specifically rule on the renewed motions, it did note that neither witness would be allowed to state [her] conclusions."[6]

The prosecutor advised the jury in his opening statement that two "professional persons" would testify:

"[Susan Holland] has a Master's Degree in Social Work. She will describe her qualifications for making the examination she made in this case.

"She will describe her examination, the symptoms she observed in this child. She will not comment to you on the symptoms. She will merely describe symptoms that she observed.

"Now Dr. Susan Holland and Dr. Meyers will not draw any conclusions regarding whether something did or did not happen. *Susan Holland will describe the symptoms.* Dr. Meyers, the evidence will show, did not contact the child or see the child or wouldn't know her. *Dr. Meyers will tell you what these symptoms mean.*

"Any conclusion that is to be drawn will be yours.

---

[6] If a transcription of any part of the oral proceedings cannot be obtained for any reason, the appellant, as soon as the impossibility of obtaining a transcript is discovered, may serve and file an application for permission to prepare a settled statement in its place. Oral proceedings may include those that a court reporter did not attend. An unreported discussion that has no bearing on appeal is not an oral proceeding that may be settled. (Cal. Rules of Court, rule 36(b); *People* v. *Gzikowski* (1982) 32 Cal.3d 580, 584-585, fn. 2 [186 Cal.Rptr. 339, 651 P.2d 1145].)

"Mary Beth Meyers, of course, will indicate to you her particular qualifications in this particular case." (Italics added.)

Susan Holland, a licensed clinical social worker, was the first expert witness to testify. Holland testified she had counseled all the child victims seen by the Fresno Rape Counseling Service over a three-year period and 25 percent of her private counseling practice was devoted to child victims. Holland examined Gypsy on one occasion for about one and a half hours. During the interview, Holland noted Gypsy was tearful several times, particularly when describing her grandmother's reaction to her disclosure and when describing her nightmares about the incidents. Holland further noted Gypsy described a feeling of depression, which Holland thought was "unusual." Holland believed Gypsy gave an adequate description of her feelings. Holland asked Gypsy if she "had been told to keep this secret." Gyspy said "[no,] but that she feared something would happen to her dad and mother if she told. . . ."

When the prosecutor asked Ms. Holland to relate what Gypsy said, defense counsel objected on hearsay grounds. The prosecution stated the evidence was offered for Gypsy's state-of-mind and defense counsel withdrew his objection. The court then advised the jury any statements quoting Gypsy were not to be considered true statements but only for the purpose of explaining *Holland's opinion*.

Holland testified Gypsy was fearful when she described two nightmares of "being kidnapped and trying to run away." Gypsy said the defendant was in both nightmares. However, Gypsy also told her the dreams occurred less frequently after she disclosed what had happened and her mother believed her. Gypsy said she felt comfortable with her mother, who was supportive, and felt uncomfortable with her grandmother, who disbelieved her. Holland also testified Gypsy said she had reported the incident to her stepsister and mother. Although Gypsy had good self-esteem when interviewed, she also described feelings which led Holland to believe Gypsy had problems with low self-esteem in the past. Gypsy also "articulated" anger when talking about her grandmother and her grandmother's failure to believe her.

On cross-examination, Holland testified Gypsy described two dreams: one in which the defendant tried to kill her and one in which he kidnapped her. She also stated Gypsy did not indicate any guilt feelings.

Mary Beth Meyers, a licensed clinical psychologist engaged in private practice, testified as the next witness. Meyers did not examine Gypsy or read any reports about her. After an initial defense objection, the prosecution posed all questions to Meyers in the form of hypotheticals. The first

hypothetical concerned the failure to report molestation. Dr. Meyers indicated it is not unusual for molested children not to tell immediately for fear of (1) being hurt; (2) having someone else hurt by the perpetrator; (3) never being believed; or (4) being blamed for being bad. Dr. Meyers also testified research indicates most child victims have nightmares in which they dream they are hurt or killed. The prosecutor asked if it is common for the perpetrator to appear in the dreams. Dr. Meyers stated the dreams are usually about the adult trying to hurt the child but the actual perpetrator is not in the dream. She testified the literature suggests recovery is more likely if the child is accepted and believed. Meyers said if adults do not believe the child, the child will sometimes be more fearful and symptomatic or become very angry and hate other family members. She also testified it is not unusual for child victims to hate the perpetrator and to fail to report the molestation while it is occurring because of fear. Dr. Meyers also noted the child experiences a feeling of helplessness if the molestation is repeated. On cross-examination, Dr. Meyers agreed there would be symptoms of depression if the molestation lasted for three summers.

The prosecutor reviewed the testimony of Holland and Meyers in his closing argument to the jury: "Now the next testimony came from Susan Holland, Mary Beth Meyer[s] and Dr. Voris, and the psychological testimony is basically what I call, what I indicated to you earlier, psychological or a mental fingerprint, maybe a footprint, maybe more appropriately in this case a penis print left on the memory of this child.

"Among other things that [Holland] told us was that the child is recovering. That was not denied.

"She's told us in this process of recovery that this crime was discovered, but she told you that, of the nightmares that this child had, one involving the defendant killing her, one involving the defendant kidnapping her and expressing that no one would believe her, which is indeed justified, because neither the mother nor the grandmother believed her, and that left an imprint on the child's mind. . . .

"Look at the child's crying, when it occurred. The first time she cried attempting to testify, and she also cried as she indicated these incidents to Susan Holland in her comfortable office, another indicia of the child, the child's state of mind.

"Now I am not going into great detail on the testimony of Mary Beth Meyers. She basically indicated to us that the symptoms she first told you of are consistent with the symptoms of a child that has been abused, and she told us the items that are consistent with abuse."

Defendant contends the trial court erroneously allowed the use of this "expert testimony" from Susan Holland and Dr. Meyers for the variety of reasons previously enumerated. They need not be repeated here for we will conclude the trial court erred in admitting the testimony, the error was prejudicial, and the judgment below must be reversed as to all counts (excluding the rape counts) and remanded for new trial.

We start with a brief summary of the present state of the law regarding the "child molest syndrome." In *Bledsoe* our Supreme Court held that the rape trauma syndrome does not meet the *Kelly-Frye* standard of admissibility as a scientifically accepted test for establishing whether a rape occurred. Therefore, such evidence is not admissible to prove guilt in a criminal trial. In *Roscoe* this court extended *Bledsoe* to child molest cases and, as defendant states, clarified the manner in which expert testimony explaining trauma behavior may be introduced. As we explained, the opinion testimony should be based upon the literature in the field and general, professional experience of the witness rather than upon an analysis and diagnosis based upon a review and evaluation of the facts in the case at hand. We went on to say: "Credibility questions arise whenever the defendant denies the victim's story, explicitly or implicitly suggesting misrecollection or fabrication. If, in every such case, the jury could be informed that a doctor had diagnosed the complainant, based upon the specific facts in the case, as a child molest victim (or rape victim, or whatever), then the protection against misuse of psychologists' testimony erected by *Bledsoe* would be largely dismantled." (*People* v. *Roscoe, supra,* 168 Cal.App.3d 1093, 1099.) In *Gray,* the Second District Court of Appeal held in a child molest case it was not error to admit expert testimony that it was common for child victims to delay reporting incidents of abuse and give inconsistent accounts of such incidents to different people, where such evidence (1) *was not offered* to prove a molestation in fact occurred, but rather (2) was offered to rebut the inference the alleged victim was being untruthful as shown by her delay and inconsistencies in reporting. Such expert testimony is proper so long as it is limited to a discussion of victims as a class (e.g., children), and does not extend to discussion and diagnosis of the witness in the case at hand. (*People* v. *Gray, supra,* 187 Cal.App.3d 213, 218.) And in *In re Sara M.,* the Third District Court of Appeal, in a Welfare and Institutions Code section 300 proceeding, reversed a dependency finding and directed the juvenile court to decide the matter *absent* the child molestation syndrome evidence which, the court concluded, was offered below to prove the child had been sexually abused.

With this brief summary in mind, we address the record before us in the instant case. This is not a case in which expert testimony of "child molest syndrome" was offered in rebuttal to rehabilitate a victim-witness. The two

expert witnesses in question, clinical social worker Susan Holland and psychologist Mary Beth Meyers, were called as witnesses in the prosecution's case-in-chief, immediately following the testimony of Gypsy. The district attorney outlined his strategy in his opening statement—"Susan Holland will describe [Gypsy's] symptoms. . . . Dr. Meyers will tell you what these symptoms mean." And, this is exactly what happened. The record reflects Ms. Holland, over objection, then was examined in substantial detail regarding her interview and evaluation of Gypsy—what Gypsy said, what emotions she exhibited, what fears she expressed about defendant, etc. Ms. Holland was followed by Dr. Meyers who, also over objection, responded to "hypothetical questions" incorporating the exact same facts and details as told by Gypsy to Ms. Holland. Dr. Meyers, in response to such questions, explained to the jury Gypsy's emotions, fears, and reactions to others are symptoms exhibited by a child molest victim. It is not significant the prosecutor told the jury Susan Holland would merely describe symptoms she observed and "[a]ny conclusion that is to be drawn will be yours." In effect and result, the prosecutor, by what he apparently perceived as brilliant subterfuge, engaged in the exact conduct, here condoned by the trial court, that was proscribed in *Bledsoe, Roscoe, Gray,* and *In re Sara M.* The challenged testimony was not offered to rehabilitate a wavering or equivocal Gypsy. Rather, it told the jury that they should accept Gypsy's version of these events as true, that she was a victim, molested over a three-year period by defendant, because here is how typical child molest victims act and Gypsy fits the mold perfectly. The following testimony of Ms. Holland, exerpted by defendant, is typical of the record before us: "Q [by prosecuting attorney] What subject matter did you generally talk to her about?

"A Very generally discussed her feelings, reactions to the court proceedings and her discussion of her feelings about the molest she had experienced.

"Q Did she describe some of the molest incidents to you?

"A Yes she did. . . .

". . . . . . . . . . . . . . . . . .

"Q Okay. Did you notice any emotional reactions?

"A Several times during the interview Gypsy was tearful."

As we noted earlier, defendant objected to the admission of evidence of a "child molest syndrome" through the testimony of these two experts from the beginning of trial. The trial court denied defendant's objections and it is

apparent that renewed or continued objections to this "expert testimony" would have been fruitless. The record reflects the trial court was aware that such testimony was admissible, at best, under very limited circumstances for specific purposes and never to prove a molest had occurred.

In our view, Ms. Holland and Dr. Meyers should not have been allowed to testify as part of the prosecutor's case-in-chief upon the record before us. If, depending on the then record, the trial court concluded expert testimony on rebuttal, for example to rehabilitate the victim, was appropriate, then much of Ms. Holland's testimony should have been disallowed as hearsay. Nor do we accept the prosecutor's argument, accepted by the trial judge, that the testimony was admissible as evidence of Gypsy's state of mind. Moreover, its prejudicial effect outweighed its probative value. In addition, assuming Dr. Meyers could properly testify for purposes other than to prove molestation had occurred, the prosecutor should not have been allowed to ask supposed hypothetical questions of her, framed upon the facts testified to by Ms. Holland, and immediately before her, by Gypsy.

Although a defendant is not entitled to a perfect trial, he is entitled to a fair trial. In the instant case, defendant did not receive a fair trial. There is no question a reasonable probability exists that had the testimony of Ms. Holland and Dr. Meyers been excluded, a different result would have been obtained. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], cert. den. 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].)

### III.

DID THE PROSECUTOR'S FAILURE TO ESTABLISH SEPARATE CORPUS DELICTI FOR EACH OFFENSE REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS FOR RAPE, SODOMY, AND ORAL COPULATION?

█ Defendant contends all of his convictions for rape, sodomy, and oral copulation must be reversed because the prosecutor did not establish separate corpus delicti for each offense.

█ The corpus delicti is established when it is proved a crime has been committed by someone. The corpus delicti consists of two elements: (1) the injury or loss or harm and (2) a criminal agency causing them to exist. The preliminary proof of the corpus delicti need not be beyond a reasonable doubt and only a slight or prima facie showing is necessary. (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 41-43 [139 Cal.Rptr. 275], cert. den. 435 U.S. 953 [55 L.Ed.2d 803, 98 S.Ct. 1582].) █ Although defendant characterizes this issue as failure of the prosecution to separately establish the corpus delicti for each offense of which defendant stands convicted, the

essence of defendant's argument here is, in his view, the failure of the victim to adequately separate, describe and identify each of the various charged acts from the multitude of other identical acts charged in the information. Defendant's argument is premised upon the rule first enunciated in *People v. Williams* (1901) 133 Cal. 165 [65 P. 323], and its progeny. In our analysis, we start with *People v. Castro* (1901) 133 Cal. 11 [65 P. 13].

In *Castro,* defendant was convicted of rape and secured a new trial. At trial the victim swore to four separate acts of sexual intercourse with defendant. The Supreme Court affirmed the new trial order holding the information charged only one act and upon that allegation had to stand or fall. Although the state could have selected any of the acts sworn to by the victim, it could not select all four. At the commencement of trial, the state should have been required to select the particular act of intercourse upon which it relied. The state failed to make the selection either at the commencement of trial or at the time when the case went to the jury.

In *People v. Williams, supra,* 133 Cal. 165, defendant was convicted of rape of a 13 year old and appealed. The Supreme Court reversed and ordered a new trial. The victim testified she lived with defendant for a period of four months and they engaged in sexual intercourse five or six times a day. Each of the acts was a separate offense and the defendant could be tried separately for each of them. The trial court did not tell the jury they all had to agree defendant performed some specifically described act. Our Supreme Court stated the prosecution must charge a specific offense and any conviction must depend upon proof of that offense alone. Proof of an offense on a different date is a variance although generally not fatal. A defendant on trial on a criminal indictment has a right to demand the charge against him be stated in ordinary and concise language. Defendant must know upon what specific charge he is to be tried so he may prepare his defense.

In *People v. Abdullah* (1933) 134 Cal.App. 155 [25 P.2d 40], defendant was convicted of two charges of rape of a minor. Defendant operated a health farm on the outskirts of Los Angeles and lived there with his wife. The victim, her widowed father, her brother, and a female housekeeper lived in a separate residence on the health farm. Defendant engaged in sexual relations with the victim between 1930 and 1932. When the victim was examined in chief, defense counsel moved the district attorney elect as to the specific acts. The trial court denied the motion stating "Any time within the three years. The specific date is not essential in this case." The district attorney later elected to stand on two specific dates—June 1932 and September 25, 1932. The Second District Court of Appeal reversed both counts and remanded for a retrial. The prosecution had a greater duty than to produce general evidence of a series of acts extending over several years.

The prosecution had the duty of naming, identifying, and proving a specific act within the statute of limitations for every count charged. A man charged with a serious sexual offense is entitled to an opportunity to defend and not merely to deny. The prosecuting witness did not remember how many acts occurred, although there were many. Only where the acts are moored to some date or circumstance can the defendant be expected to meet them. The prosecuting witness failed to mention any circumstance designating any one particular act and reversal was required.

In *People* v. *Creighton* (1976) 57 Cal.App.3d 314 [129 Cal.Rptr. 249], disapproved on other grounds in *People* v. *Thomas* (1978) 20 Cal.3d 457, 468 [143 Cal.Rptr. 215, 573 P.2d 433], defendant was convicted of committing a lewd and lascivious act on a female under age 14 (§ 288) and acquitted of rape (§ 261.5). He appealed, contending (1) the People did not prove even one specific act during the period alleged and (2) the trial court erroneously instructed the jury in CALJIC No. 4.71. The Second District Court of Appeal concluded the trial court erroneously instructed the jury in CALJIC No. 4.71 and erroneously denied a defense motion for acquittal because the prosecution never proved a single offense. The reviewing court found substantial evidence of crimes before the trier of fact but no evidence as to an individual, specific crime. All the elements were present except time and a specific incident. Absent CALJIC No. 4.71, the jurors could not have singled out any one act or incident from the general evidence on which to convict the defendant. This was not due to failure to prove an act occurred on a specific date or time. Rather, there was a failure to prove any one act within the statute of limitations. Although the general evidence was substantial, it was too general to support a verdict. The appellate court concluded there was no possible way of singling out one individual act from among those claimed and saying there was substantial evidence to prove that act.

We first briefly address defendant's contention the corpus delicti of the individual charges here involved was not established. ▮ In our view, such a challenge is inappropriate here because the timeframe is not an element of the crime for corpus delicti purposes. Rather, time is a problem associated with pleading and proof. Time specifically affects the defendant's right to notice of the specific charge alleged and his or her ability to adequately prepare a defense. (*People* v. *Gordon* (1985) 165 Cal.App.3d 839, 870 [212 Cal.Rptr. 174] (conc. opn. of Sims, J.); *People* v. *Ramirez* (1979) 91 Cal.App.3d 132, 137 [153 Cal.Rptr. 789]; *People* v. *Puckett* (1975) 44 Cal.App.3d 607, 611 [118 Cal.Rptr. 884].) ▮ Notice of the specific charge is a constitutional right of the accused. (*People* v. *Puckett, supra,* 44 Cal.App.3d at p. 611.) An information which charges a criminal defendant with multiple counts of the same offense does not violate due process so

long as (1) the information informs defendant of the nature of the conduct with which he is accused and (2) the evidence presented at the preliminary hearing informs him of the particulars of the offenses which the prosecution may prove at trial. (*People* v. *Jordan* (1971) 19 Cal.App.3d 362, 369-370 [97 Cal.Rptr. 570]; *People* v. *Tolbert* (1986) 176 Cal.App.3d 685, 690, fn. 2 [222 Cal.Rptr. 313].) The information plays a limited but important role—it tells a defendant what kinds of offenses he is charged with and states the number of offenses that can result in prosecution. However, the time, place, and circumstances of charged offenses are left to the preliminary hearing transcript. This is the touchstone of due process notice to a defendant. (*People* v. *Gordon, supra,* 165 Cal.App.3d 839, 870-871 (conc. opn. of Sims, J.).) So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant and covers the timeframe(s) charged in the information, a defendant has all the notice the Constitution requires. The defendant may demur if he or she believes the lack of greater specificity hampers the ability to defend against the charges. (§ 1004, subd. 2.) Failure of a defendant to demur bars any assertion on appeal of vagueness in the information. (§ 1012.)

■ Addressing the more specific aspect of defendant's argument here, he concedes the prosecution presented sufficient evidence of specific acts of intercourse to sustain two of the first three counts alleged in the information. These counts alleged acts of intercourse which occurred in 1984. The prosecutor began his examination of Gypsy by having her describe an act of intercourse which she said occurred during the summer of 1984 when she was between the third and fourth grades. The prosecutor also asked Gypsy to describe an unrelated act of intercourse that occurred at the creek during that same summer. Defendant acknowledges Gypsy's descriptions of those two acts constituted sufficient evidence to sustain two of the first three rape counts alleged in the information. However, defendant contends there was no evidence of specific acts of intercourse to support the third count of rape alleged to have occurred in 1984, the three counts of rape alleged to have occurred in 1983, and the three counts of rape alleged to have occurred in 1982. Defendant further contends the prosecution failed to introduce any evidence of specific acts of sodomy to support the nine sodomy counts and evidence of specific acts of oral copulation to support the six copulation counts. Gypsy testified defendant had intercourse with her "a lot" during the summers of 1982, 1983, and 1984. She said defendant engaged in sexual intercourse with her more than three times each summer. She also said defendant sodomized her more than three times during each of the summers of 1982, 1983, and 1984. She also said the defendant engaged in oral copulation with her more than once in each of those three years.

For purposes of discussion of this issue, we will ignore our conclusions in part I of this opinion reversing the nine rape counts. Upon retrial, Gypsy's

testimony as to the various acts of intercourse with defendant during the three summers involved would be properly admissible as to the nine counts of alleged violation of section 288, subdivision (a).

The People properly note the instant case is factually distinguishable from the ones cited by the defendant. First, Gypsy did not testify in vague terms as to the number of times each act occurred. With respect to the rapes, she said they "happened a lot" but later said it happened more than three times each summer. She gave similar testimony with respect to the sodomy charges and said the oral copulation offenses occurred more than once each summer. Thus, she testified there were at least three separate rape and sodomy offenses and two oral copulation offenses each summer. Unlike the victims in *Creighton* and *Abdullah,* Gypsy was specific as to the months involved. She said these incidents happened every June, July, and August between the first and fourth grades. She also said they occurred only during the week and never on weekends. Gypsy said the light in the room came from the sun. This established the events occurred during the daytime. She further testified the events occurred when her uncle cared for her and her cousins while her aunt and grandparents were gone. She indicated her cousins arrived at about 4 p.m. from which the jury could reasonably infer the events occurred in the afternoon. Unlike the victims in the cited cases, Gypsy identified where the incidents occurred. With the exception of the rape at the creek, Gypsy said all of the incidents occurred on the bed in her grandmother's living room. She described that room in detail, including the placement of the windows. Clearly, Gypsy was more precise about the time and place of the incidents than the victims in the cases cited by defendant. Although she could not identify each act by specific date, she did narrow down the timeframe within which the individually charged acts as more specifically described by her occurred. More specificity regarding the various criminal acts alleged is desirable, depending on the age of the victim, the number of incidents involved, the similarity of some of the incidents to another or others, and the time lapse between occurrence and trial. However, such specificity may not always be possible. This appears to be such a case.

In our view, the prosecution adequately charged and proved the various offenses alleged against the defendant, excepting the rape counts as previously stated, and reversal is not required for failure to establish a separate corpus delicti.

## IV.

### Should the Convictions on the Nine Counts of Lewd and Lascivious Behavior be Reversed Because It Is Impossible to Determine Upon What Acts the Jury Based Its Verdicts?

Defendant contends the nine counts of lewd and lascivious conduct must be reversed because it is impossible to determine upon what acts the jury based its verdicts.

In view of our conclusions in part II of this opinion, this issue is deemed moot. Upon retrial, the rape counts will have been stricken from the information and there should not, or at least need not, be any overlap between the sodomy and oral copulation counts and the lewd and lascivious conduct counts. In addition, depending upon the then state of the record, the trial court may instruct the jury in the language of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that as to each count charged the defendant committed the same specific criminal act. (Cal. Const., art. I, § 16; *People v. Gordon, supra,* 165 Cal.App.3d 839, 853; *People v. Madden* (1981) 116 Cal.App.3d 212, 219 [171 Cal.Rptr. 897].) We remind counsel and the trial court that in an appropriate case, the duty to instruct in CALJIC No. 17.01 or its equivalent is a sua sponte one. (*Ibid.*)

The judgment of conviction is reversed as to all counts and the matter is remanded for new trial except as to the rape counts as more particularly set forth herein.

**HAMLIN, J.**—I dissent from part I of Justice Martin's opinion holding there was insufficient evidence to support the jury's finding that defendant was guilty of nine counts of rape of Gypsy. This holding follows from the lead opinion's conclusion that "there is no substantial evidence that defendant accomplished the acts of sexual intercourse by means of fear of immediate and unlawful bodily injury." (*Ante,* p. 328.) The majority could properly have arrived at that conclusion as to all the rape charges only if it deemed the unequivocal testimony of the victim to be not reasonable in nature, credible and of solid value when considered in light of the totality of the circumstances. (*People v. Barnes* (1986) 42 Cal.3d 284, 303-307 [228 Cal.Rptr. 228, 721 P.2d 110].)

In this case, the victim testified unequivocally she followed defendant's directions and submitted to his sexual acts because she was afraid not to do so. She explained she feared what might happen to her mother, her stepfather or her. That testimony was necessarily evaluated by the jury in light of

the testimony of the victim, defendant and others that defendant and the victim's stepfather Karl had a fistfight in 1983. A six-year-old victim could readily have considered her uncle's directions to her while he was baby-sitting her in her grandmother's home were authoritative and, under all of the circumstances of this case, that resistance would have been useless and likely to result in bodily injury to her, her mother or her stepfather.

As our Supreme Court reminded us in *People* v. *Huston* (1943) 21 Cal.2d 690, 693 [134 P.2d 758], disapproved on another point in *People* v. *Burton* (1961) 55 Cal.2d 328, 352 [11 Cal.Rptr. 65, 359 P.2d 433]: "Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (Cited with approval in *People* v. *Barnes, supra,* 42 Cal.3d at p. 306.)

Thus, I cannot agree with the lead opinion's holding that there is "no evidence in this record from which the jury could have reasonably concluded that defendant committed any rape of Gypsy by means of fear of immediate and unlawful bodily injury." (*Ante,* p. 329.)

 I concur in the remainder of Justice Martin's lead opinion. I would reverse the judgment and remand for new trial on all counts.

BEST, J.—I dissent from that portion of part III of Justice Martin's lead opinion holding that the prosecution presented evidence sufficient to prove each of the nine acts of sodomy charged in counts IV, V, VI, XV, XVI, XVII, XXVI, XXVII, and XXVIII; each of the six acts of oral copulation charged in counts VII, VIII, XVIII, XIX, XXIX, and XXX; and each of the nine acts of lewd and lascivious conduct with a child under age fourteen charged in counts IX, X, XI, XX, XXI, XXII, XXXI, XXXII, and XXXIII. For reasons set forth in this court's opinions in *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352], review denied August 18, 1988, and *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863], I would hold that, except for two acts of sexual intercourse in 1984

and one act of sodomy in 1981, the People failed to meet their burden of proving a specific offense for each of the charged offenses.

In *Van Hoek* and *Atkins,* after a discussion of *People* v. *Castro* (1901) 133 Cal. 11 [65 P. 13] and *People* v. *Williams* (1901) 133 Cal. 165 [65 P. 323], we stated, "Implicit in the cases requiring specificity of charges and the charges being supported by specific testimony given at trial is the fundamental due process rule, steeped in antiquity, that the prosecution must prove a specific act and twelve jurors must agree on one specific act." (*Van Hoek, supra,* 200 Cal.App.3d at p. 817; *Atkins, supra,* 203 Cal.App.3d at pp. 15, 21.) Unless the evidence is of a nature to permit the jurors to single out a specific identifiable criminal act and unanimously agree that act was committed by the defendant as charged in each count of the information, fundamental due process has not been complied with.

Here, Gypsy testified to one specific act of sodomy committed by defendant occurring in the summer of 1981 at her grandmother's house when she was about six years old and between kindergarten and first grade. Defendant told her cousins to stay outside the house and locked the door. He then told Gypsy to take her clothes off and to lie on the bed in the living room. Gypsy did as she was told and defendant stuck his penis in her anus. Gypsy also testified that defendant placed his penis in her anus "a lot"; more than three times in 1982; more than three times in 1983; and more than three times in 1984. She testified that all of these acts occurred on the living room bed in her grandmother's house.

Gypsy testified to a specific act of sexual intercourse committed by defendant that occurred during the summer of 1984 when she was between the third and fourth grades. She also described another specific act of sexual intercourse that occurred that same summer at the creek. She did not testify about any other specific acts of sexual intercourse. Rather, she stated that defendant had intercourse with her "a lot" in 1984, more than three times; more than three times in 1982; and more than three times in 1983. She testified that with the single exception of the incident at the creek, all of the acts of sexual intercourse took place on the living room bed at her grandmother's house while her cousins were playing outside.

Although Gypsy testified that defendant placed his penis in her mouth, she did not testify as to any specific incident. She did not know how many times this occurred; however, he did it more than once in 1982; more than once in 1983; and more than once in 1984. Each of these incidents of oral copulation occurred on the bed in the living room at her grandmother's house and each year they took place between June and August.

The nature of Gypsy's testimony made it impossible for the jury to single out and unanimously agree that defendant committed a specific act of oral copulation identifiable by time, place, or other circumstance, much less six separate and identifiable specific acts of oral copulation. From the nature of the evidence, the jury was also incapable of singling out and unanimously agreeing upon any acts of sexual intercourse other than the one occurring during the summer of 1984 when Gypsy was eight years old, and the one that same summer at the creek. For the same reason, the jury was incapable of singling out and unanimously agreeing that defendant committed a specific and identifiable act of sodomy other than the one occurring in 1981 when Gypsy was about six years old. In my view, therefore, consistent with our opinions in *Van Hoek* and *Atkins,* the evidence was insufficient to support a conviction for any other alleged criminal acts and retrial for any acts of sexual molestation other than the three specific acts just referred to would be barred by double jeopardy principles. (*People* v. *Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468].)

For the same reasons, I must dissent from part IV of the lead opinion holding moot defendant's contention that his convictions of lewd and lascivious conduct must be reversed because it is impossible to tell upon what acts the jury based its verdicts. Other than the one specific act of sodomy—that would have supported a conviction of either a violation of Penal Code section 286, subdivision (c), or a violation of Penal Code section 288, subdivision (a)—and the two specific acts of sexual intercourse referred to above, there was a complete absence of evidence of specific identifiable acts of sexual abuse to support the charges of lewd and lascivious conduct. I also dissent from the suggestion in part IV of the lead opinion that giving a unanimity instruction—CALJIC No. 17.01 or CALJIC No. 4.71.5 or an equivalent—would cure the problem. As we stated in *Van Hoek* and *Atkins*: "The Attorney General apparently relies on the so-called 'either/or' rule which was recently stated as follows: 'Emerging from recent cases dealing with the problems arising when a crime is charged and the evidence describes several such acts, any one of which could constitute the crime charged, "is the so-called 'either/or' rule: . . . *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed in the words of CALJIC No. 17.01 or 4.71.5 or their equivalent that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific act. [Citations.]" [Citation.]' (*People* v. *Callan* (1985) 174 Cal.App.3d 1101, 1111, fn. omitted [220 Cal. Rptr. 339].)

"While the 'either/or' rule as stated above will cure a failure of election by the prosecutor in the usual case where evidence of several specific acts is presented, any one of which could constitute the crime charged, the rule can have no application in a case such as the present one where there is a

failure to present evidence of *any* specific act to support the charged crime. Where, as here, the evidence is that many of such acts were committed over an extended period of time, it would be impossible for the prosecution to 'select the specific act relied upon to prove the charge' and equally impossible for the jury to 'unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.' As stated in *People v. Williams, supra,* 133 Cal. 165, 168, 'Such a trial, upon a charge so indefinite as to circumstance of time or place, or any particular, except by the general designation, would be a judicial farce, if it were not something a great deal worse.' " (*People v. Van Hoek, supra,* 200 Cal.App.3d 811, 816; *People v. Atkins, supra,* 203 Cal.App.3d 15, 21.)

■■■■■■■ I concur in the rest of Justice Martin's lead opinion.

Accordingly, I would reverse the judgment, but remand for retrial only on counts IX and X, the first two counts set forth in the information charging defendant with a violation of Penal Code section 288, subdivision (a), committed between June 1984 through August 1984, and counts XXVI and XXXI, the first counts of the information charging defendant with a violation of Penal Code sections 286, subdivision (c), and 288, subdivision (a), respectively, committed between June 1982 and August 1982. Although the information did not charge defendant with criminal acts occurring during a timeframe which included the summer of 1981, this variance would not preclude a retrial of defendant for an act of sodomy or lewd and lascivious conduct occurring at that time. (See *People v. Wrigley* (1968) 69 Cal.2d 149, 154-159 [70 Cal.Rptr. 116, 443 P.2d 580].)