Filed 3/13/25  P. v. Dominguez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E080878 |
| v. | (Super. Ct. No. RIF2000995) |
| SALVADOR RINCON DOMINGUEZ, JR., | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Stephen J. Gallon, Judge.

Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn, and Jon S. Tangonan, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant and appellant Salvador Dominguez, Jr. appeals from judgment entered following jury convictions for forced oral copulation of his biological daughter, Jane Doe, who was under 10 years old or younger (Pen. Code, § 288.7, subd. (b)[1]; counts 1 & 2); lewd and lascivious acts on Doe, a child under 14 years old (§ 288, subd. (a); counts 3 & 4), and lewd and lascivious acts on Doe, a child under 14 years old, by force or fear (§ 288, subd. (b)(1); count 5). The court sentenced defendant to a prison term of 30 years to life, plus a consecutive prison term of 16 years.

Defendant contends the trial court prejudicially erred in ordering him to wear leg restraints during trial, and allowing improper expert testimony regarding child sexual abuse victims. Defendant further contends the trial court prejudicially erred in denying his proposed limiting instruction on the fresh-complaint doctrine. Defendant argues that the prosecutor committed prejudicial misconduct, and finally, the trial court erred in failing to exercise its discretion properly when sentencing defendant on counts 3, 4, and 5. We reject defendant's contentions and affirm the judgment.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

## II.

## FACTS

Defendant and Mother's biological daughter, Doe, was born in July 2012. Defendant and Mother separated when Doe was three years old. Pursuant to a custody agreement, Doe spent every other weekend with defendant and lived with Mother the rest of the time until 2019. In the spring of 2019, when Doe was seven years old, Mother agreed to let Doe live with defendant full-time. They lived with defendant's girlfriend, Cindy, Cindy's siblings, Kandice and Dustin, and Cindy's mother and father. Doe shared a bunkbed with Kandice. Defendant and Cindy shared another bed in the same bedroom.

Doe testified at trial that, while she was staying with defendant when she was seven or eight years old, defendant picked her up from school, took her to the bedroom, and told her to orally copulate him. On one occasion, when Doe was seven years old and living with defendant, defendant asked Cindy to make dinner. When Cindy left the bedroom to cook dinner, defendant pulled down his pants and said to Doe, "[H]ey, you wanna play?" Doe said "no." Defendant forced her to play with his "private part." On another occasion, defendant asked Kandice to get groceries from the car, and then defendant forced Doe to touch his penis and kissed Doe on the mouth. When Doe tried to pull her hand away, defendant grabbed her hand and forced her to touch his penis.

The first time defendant made Doe orally copulate him was after she got home from school and was in the bedroom alone with defendant. Defendant closed the door, unzipped his pants, and told Doe to get on the bed. He told her to suck his penis and he

3

would give her a lollipop. Doe refused but defendant made her do it, so she did it until he told her to stop. Afterwards, defendant opened the bedroom door. Doe felt sad, scared, and later, angry. Doe did not want to tell Cindy or Kandice because Doe thought they would not believe her.

Defendant forced Doe to orally copulate him multiple times. He forced her to orally copulate him every day she went to his home after school. He did it in the bedroom with the door locked and no one else in the room. Doe knew if she did not participate, she would get in trouble. Defendant also gave Doe a popsicle and a Sponge Bob gummy bear after the forced oral copulation assaults.

Doe further testified that the first time she told anyone about what defendant was doing to her was while she and other family members were driving to get pizza. Doe told Mother because she was tired of it. Mother asked her why she did not tell her before. Doe said she didn't because she was afraid defendant would find out. She believed she would get into trouble if she did not do what defendant told her to or if she disclosed what was happening. She also thought no one would believe her. After Doe told Mother, they drove straight to the police station to report it.

Mother testified that on October 13, 2019, while she, her boyfriend at the time (SF), Doe, and two other young children were driving to get food, there was a conversation about something on a TV show, and Doe said, "my dad, like, did that to me." The conversation in the car was prompted by Doe scratching her vaginal area. Mother asked Doe if anyone had been doing that to her and why she was doing that. Doe

4

disclosed for the first time to Mother that defendant had been doing it to her. Mother and her family drove directly to the police station. Because the police station was closed when they arrived on Sunday, Mother took Doe back the next day to make a report. Mother reported to the police dispatcher that the day before Doe told her and SF that Doe's father, defendant, had been sexually abusing Doe at his home on an ongoing basis.

Six months before the allegations were made, Mother told Doe she wanted to move to Utah. A custody hearing was scheduled for after Christmas that year. Mother wanted primary custody. Mother testified that in September 2019, she asked Doe if anyone had ever touched her, and Doe said no. Mother routinely discussed with Doe that it was inappropriate for people to touch her private area and that Doe should tell her if it happened.

Defense witnesses, Cindy, Cindy's mother, and Kandice,[2] testified they never saw any evidence of defendant acting inappropriately or sexually with Doe. They were not aware of defendant ever being in the bedroom alone with Doe, or seeing Doe and defendant exit the bedroom together. They did not believe defendant would or had sexually abused Doe.

Riverside Police Detective Ramos of the sexual assault child abuse unit testified that she was assigned to defendant's case. Ramos interviewed Cindy, Cindy's mother, and Kandice on October 15, 2019. When Ramos asked Cindy what she thought about the

_____

[2] Kandice testified she was 13 years old in October 2019, and 16 years old when she testified.

5

allegations against defendant, Cindy responded that "she was going to try to get [defendant] out of the situation."

On October 15, 2019, Dr. Grant performed a child sexual abuse exam on Doe. No findings were made. As to Doe's itching, he recommended she improve her hygiene. At Doe's forensic interview by a police forensic interviewer the same day, Doe said that defendant put her mouth on his private part, and this happened many times. He forced her to play with his private part with her hand. He grabbed her hand and made her touch his private part. He also kissed her on the lips. It happened in the bedroom, with the door locked. If she did not do it, she would not get a popsicle or a Sponge Bob gummy bear. He told her not to tell anyone or he would spank her and she would be grounded.

During the trial, Dr. Thomas, a clinical and forensic psychologist, testified regarding the child sexual abuse accommodation syndrome (CSAAS) and behavior patterns of child victims of sexual abuse.

Dr. Gomez, a forensic clinical neuropsychologist, evaluated defendant for sexual deviance and found no evidence that defendant suffered from pedophilia. On cross-examination, Dr. Gomez testified that not every person who sexually abuses a child is a pedophile.

A child protective services (CPS) employee testified that on April 4, 2019, she interviewed Doe. Doe denied anyone had touched her private part. Mother told the CPS employee that she believed defendant had complained to CPS that her house was dirty because he wanted full custody of Doe.

## III.

## RESTRAINTS DURING TRIAL

Defendant contends the trial court abused its discretion by ordering him restrained during trial.  Defendant asserts that the use of a hobble device, worn under his pants on his ankles, violated his constitutional right to a fair trial because there was no showing of a manifest need for restraint.  There was no showing defendant posed a threat of violence or nonconforming behavior.

Although the federal constitution prohibits only visible shackling, under *Bracamontes*, the state prohibition is broader.  (*Bracamontes*, *supra*, 12 Cal.5th at p. 991; see also *People v. Mar* (2002) 28 Cal.4th 1201, 1217-1219 on improper use of non-visible stun belt; *People v. Duran* (1976) 16 Cal.3d 282, 291 ["The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion"]; section 688.)  We nevertheless conclude that any such error was not prejudicial.

A. *Leg Restraint Procedural and Factual Background*

During a pre-trial hearing on defendant's motion in limine (MIL) to prohibit the use of a hobble device on him during the trial, defense counsel explained that the hobble device defendant was wearing during the hearing "is a device that essentially locks up when he straightens his leg and makes it so presumably someone could not efficiently run away if they tried to do so.  In order to unlock the device, Mr. Dominguez will need to physically reach down, I believe there is a button at the knee that unlocks it to allow him

7

to sit down." The trial court ruled that defendant would be required to wear the hobble device throughout the trial.

During the trial, defense counsel noted that defendant was still wearing the hobble device and renewed defendant's objection to being required to wear the device. The court responded that it had observed defendant multiple times coming and going in the courtroom, and had not observed anything that would violate his due process rights.

B. *Applicable Law Regarding Leg Restraints*

""""In general, the 'court has broad power to maintain courtroom security and orderly proceedings' [citation], and its decisions on these matters are reviewed for abuse of discretion. [Citation.] However, the court's discretion to impose physical restraints is constrained by constitutional principles. Under California law, 'a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints.' [Citation.] Similarly, the federal 'Constitution forbids the use of visible shackles . . . unless that use is "justified by an essential state interest"—such as the interest in courtroom security— specific to the defendant on trial.' . . .'" [Citation.] 'The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion.' [Citation.] '"In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' [Citation.] These factors include evidence establishing that a

defendant poses a safety risk, a flight risk, or is likely to disrupt the proceedings or otherwise engage in nonconforming behavior.'" [Citation.]" (*People v. Bracamontes* (2022) 12 Cal.5th 977, 990-991 (*Bracamontes*).)

When determining whether to impose physical restraints, the court "'must seriously consider the question on an individualized basis and ensure there is an adequate record for their ruling. Constitutional principles 'prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.' [Citation.] . . . 'The mere facts that the defendant is an unsavory character and charged with a violent crime are not sufficient to support a finding of manifest need.' [Citation.]" (*Bracamontes*, *supra*, 12 Cal.5th at p. 991.)

When the prosecution requests restraints, "the People should place facts justifying their use on the record 'so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints.' [Citations.]" (*Bracamontes*, *supra*, 12 Cal.5th at p. 993.) "[I]f the defense disagrees with the trial court's initial assessment of the visibility of the restraints at any point during trial, the defense should object so the trial court can make an appropriate record." (*Ibid*.)

C. *Prejudice Analysis*

The People argue that ordering the leg restraints was harmless error because the leg restraints were not visible to the jurors, and the restraints did not prevent defendant from receiving a fair trial or inhibit his ability to assist in his defense. We agree.

"[W]here a court improperly orders the use of visible physical restraints, '[t]he State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained."' [Citations.]" (*Bracamontes*, *supra*, 12 Cal.5th at p. 994, quoting *Deck v. Missouri* (2005) 544 U.S.622, 635; see also *Chapman v. California,* 386 U.S. 18, 24.) "[W]here a court, without adequate justification, orders the defendant to wear *shackles that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' (*Chapman v. California*[, *supra*, at p.] 24.)" (*Deck v. Missouri*, *supra*, at p. 635; italics added.)

Defendant stated in his pretrial MIL that the restraints were visible: "The Riverside Sheriff's Office Deputies have a pattern of fitting every in-custody defendant engaged in trial with a hobble leg bracket device at a minimum. The hobble device would substantially limit Mr. Dominguez's movement in that it locks in place when his leg is straightened and he must manually unlock the device in order to unlock the metal bar holding his leg straight. The buckles, on his thigh knee, and ankle, will be visible to the jury through his pants or, with regard to the ankle buckle, will not be covered by his pants when he is seated."

This statement in defendant's MIL does not constitute admissible evidence that defendant's leg restraints were actually visible or seen by the jurors. The statement is not testimony or a declaration made under oath. It is merely argument stated in defendant's

10

MIL, lacking in foundation and unsupported by any evidence as to the actual appearance of defendant's leg restraints.

During the MIL hearing, defense counsel told the court that defendant would need to stand up and sit down when the jurors entered and exited the courtroom. When defendant stood, the jurors might be watching him, "[a]nd while it is secured under his pants, the buckles on the restraint are rather substantial and make it clear that there is something that is attached to his knee, thigh, and at his ankle." This statement by defense counsel was also argument, not evidence that the leg restraints were actually visible and were seen by the jury.

In response, the trial court stated it was very familiar with the leg restraints and with the need to balance the need to control security and safety in the courtroom with defendant's right to due process and a fair trial. The trial court further stated: "I understand the need to make certain specific findings depending upon the nature of the restraints, whether things are visible or not visible, the nature of the restraints. And based upon what is requested, the leg brace with respect to him, I will make the finding that there is no denial of due process by him wearing this. It's under his clothing in front of the jury, and I am going to make the finding that it will be okay to proceed to trial and not that it violates his due process." The court added that it would make reasonable accommodations "to have him seated before the jury comes in on a break or anything like that if there are any concerns about him walking around the courtroom."

11

A reasonable inference can be made that the trial court observed defendant in the courtroom while defendant was wearing leg restraints, and found that the leg restraints were not visible while he was sitting.  The court further took measures to ensure the jurors did not observe the leg restraints if defendant stood up or walked in the courtroom.  When the trial court made its findings and ruling allowing the leg restraints, the trial court relied on its observation of defendant in the courtroom during the MIL hearing, during which he was wearing leg restraints.  The trial court's statements regarding its observations establish that the leg restraints were not visible to the jury while defendant was sitting.  There also is no evidence that the jury actually saw the leg restraints during the trial.  (*Bracamontes*, *supra*, 12 Cal.5th at p. 993.)

In *People v. Bracamontes* (2022) 12 Cal.5th 977, the trial court denied the defendant's motion objecting to being shackled during trial.  (*Id*. at pp. 990, 994.)  The *Bracamontes* court held that the trial court abused its discretion by ordering the defendant to wear shackles, because the record did not show the defendant was violent, threatened violence, or committed other nonconforming conduct.  (*Id*. at pp. 990, 994.)  The *Bracamontes* court further held that, even if some jurors briefly glimpsed the restraints during voir dire, there was no prejudicial error because there was strong evidence of guilt and no evidence the restraints inhibited the defendant's ability to assist in his defense. (*Id*. at pp. 990, 994, 996.)

The *Bracamontes* court explained that all that could be established was that "for an unspecified period of time during voir dire, some prospective jurors may have seen a

portion of the 'wire' used in the system. 'Brief glimpses of a defendant in restraints have not been deemed prejudicial.'" (*Bracamontes*, *supra*, 12 Cal.5th at p. 994.) "[W]e have consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson* (2001) 25 Cal.4th 543, 596.)

Here there is no evidence in the record that the jurors could actually see defendant's leg restraints or that the restraints impaired or prejudiced his right to testify or participate in his defense. Furthermore, the court's statements confirmed that the restraints were not visible. We therefore conclude that, even though the trial court erred in requiring defendant to wear leg restraints during his trial, it was harmless error. (*People v. Anderson*, *supra*, 25 Cal.4th at p. 596.) It is clear beyond a reasonable doubt that no aspect of the shackling affected the judgment. (*People v. Miracle* (2018) 6 Cal.5th 318, 350, fn. 6; *Chapman v. California*, *supra*, 386 U.S. at p. 24.)

IV.

EXPERT TESTIMONY ON CSAAS

Defendant contends the trial court prejudicially erred in allowing improper expert opinion testimony by Dr. Thomas on CSAAS and common behaviors of child molestation victims. Defendant argues allowing this testimony violated his constitutional right to a fair trial. We disagree.

A. *Applicable Law*

CSAAS is characterized by our State Supreme Court as "common stress reactions of children who have been sexually molested ('child sexual abuse accommodation syndrome'), which also may include the child's failure to report, or delay in reporting, the abuse." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).)

Our high court has held that CSAAS evidence is admissible to rehabilitate a sexually abused child witness's credibility "when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; *People v. Munch* (2020) 52 Cal.App.5th 464, 468.) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin*, *supra*, at p. 1301; *People v. Munch*, *supra*, at p. 468.) CSAAS evidence, however, is not admissible to prove that a child witness has been sexually abused. (*McAlpin*, *supra*, at p. 1300.) The expert also may not give an opinion on whether the child witness is telling the truth. (*People v. Long* (2005) 126 Cal.App.4th 865, 871; *People v. Munch*, *supra*, 52 Cal.App.5th at p. 468.)

B. *Relevant Procedural and Factual Background*

The People filed a pre-trial motion to admit evidence of CSAAS, including testimony by Dr. Thomas. During the hearing on the issue, the trial court agreed to reserve ruling on admissibility of the CSAAS evidence until after Doe's trial testimony.

14

Doe testified at trial regarding the details of several instances of defendant sexually abusing her. Doe stated she did not want to tell Cindy or Kandice because Doe thought they would not believe her. Doe further testified that she did not tell Mother sooner because she was afraid defendant would find out. She believed she would get into trouble if she did not do what defendant told her to or if she disclosed what was happening. She also thought no one would believe her.

After Doe's testimony and over defendant's objection, the trial court permitted evidence of CSAAS, including Dr. Veronica Thomas's testimony on the factors of secrecy, helplessness, accommodation, and unconvincing and delayed disclosures. Before testifying on these factors, the trial court gave the jury a limiting instruction stating: "You are about to hear testimony from this witness, Dr. Thomas, regarding child sexual abuse accommodation syndrome. This testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against the alleged victim in this case. And you may consider this evidence only in deciding whether or not Jan Doe['s] . . . conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." (See CALCRIM No. 1193.)

Dr. Thomas then testified regarding CSAAS and behavior patterns of child victims of sexual abuse. Dr. Thomas acknowledged that there is no clinical method available to distinguish between valid molestation claims and fantasy or false claims. Also, there is no actual syndrome, even though CSAAS is referred to as a syndrome. CSAAS is also

15

not a valid, recognized diagnosis. CSAAS evidence is thus not proof molestation has occurred. CSAAS merely consists of common ways in which sexually abused children may talk about or respond to their experience. Dr. Thomas testified about these common victim responses and behaviors, which include (1) secrecy, (2) feeling helpless, (3) accommodation, and (4) unconvincing and delayed disclosures.

Dr. Thomas further testified that child sexual abuse victims will often keep sexual abuse secret and delay disclosure because they think they did something wrong, they might not be believed, or they might get in trouble. They might not understand what happened or be able to articulate the experience. Victims also commonly forget details of the sexual abuse incidents, disassociate, block a memory, or adopt a fantasy. Most child sexual abuse occurs within an existing relationship between the victim and abuser. Accommodation is a psychological or cognitive response in which the child believes it is better not to report the abuse in order to keep the peace and not be frightened.

C. *Analysis*

Defendant argues that Dr. Thomas's testimony was improperly used to suggest he molested Doe. The People argue Dr. Thomas's testimony was admissible to disabuse the jury of some widely held misconceptions about sexually abused victims' behaviors, so that the jury could evaluate the evidence and Doe's credibility as a witness free of the constraints of incorrect assumptions.

Relying on *People v. Bledsoe* (1984) 36 Cal.3d 236, the court in *People v. Bowker* (1988) 203 Cal.App.3d 385, explained that testimony concerning the common

16

psychological effects of child abuse cannot be used as a predictor of child abuse, but it may "be used to disabuse the jury of common misconceptions concerning abuse victims. [Citation.] First, the CSAAS evidence must be addressed to a specific 'myth' or 'misconception' suggested by the evidence. [Citation.] Second, 'if requested the jury must be admonished "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. . . . The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested."' [Citations.]" (*People v. Housley* (1992) 6 Cal.App.4th 947, 955; see also *People v. Bowker*, *supra*, at pp. 391-394.)

As to the first requirement, Dr. Thomas's testimony addressed misconceptions relating to child abuse victims (1) delaying reporting sexual abuse, (2) keeping the abuse a secret, and (3) accommodating the defendant's perpetration of the abuse by cooperating with defendant during the abuse. There was sufficient evidence to support Dr. Thomas's expert testimony regarding these misconceptions. There was evidence Doe delayed reporting the molestation, which began in the spring or summer of 2019, and continued until Doe reported it on October 13, 2019. There was also evidence that Doe kept the sexual abuse secret by not telling anyone until October 13, 2019, and she accommodated defendant abusing her by complying with his demands to orally copulate him even though she did not want to.

The trial court also satisfied the second requirement to admonish the jury before Dr. Thomas testified regarding CSAAS evidence, by giving the jury a limiting instruction regarding relying on the CSAAS evidence before Dr. Thomas testified. The trial court further instructed the jury at the end of the trial by giving CALCRIM No. 1193, stating: "You have heard testimony from Dr. Veronica Thomas regarding child sexual abuse accommodation syndrome. [¶] Dr. Veronica Thomas's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Jane Doe's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of [her] testimony."[3]

Defendant cites *People v. Jeff* (1988) 204 Cal.App.3d 309 (*Jeff*), for the proposition the trial court erred in allowing Dr. Thomas's testimony on CSAAS. *Jeff* is distinguishable. There, the defendant was convicted of multiple counts of sexual abuse of his niece, who was under the age of 14. At trial, the court admitted into evidence, over defendant's objection, expert testimony from a licensed clinical social worker and a clinical psychologist who described the child's symptoms in detail and what those symptoms meant within the context of the "child molest syndrome" (also known as CSAAS). (*Id*. at pp. 320-321.)

---

[3] We note the trial court omitted from the form instruction the following language: "Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse."

The *Jeff* court held that the trial court prejudicially erred in admitting the evidence, because the trial court permitted the prosecution to introduce the child's post molestation behavior and statements to prove the charged offenses actually occurred. (*Jeff, supra*, 204 Cal.App.3d at pp. 333, 337.) The *Jeff* court explained that the child molest syndrome expert testimony authorized by *People v. Bledsoe, supra*, 36 Cal.3d 236, to permit rehabilitation of a complainant's credibility is limited to discussion of victims as a class, and does not extend to discussion and diagnosis of the witness in the case at hand. (*Jeff, supra*, Cal.App.3d at pp. 331-332; *People v. Roscoe* (1985) 168 Cal.App.3d 1093, 1099-1100.)

*Jeff* is distinguishable from the instant case because Dr. Thomas did not tell the jury that they should accept Doe's version of the events as true because her behavior was typical of child molest victims. (*Jeff, supra*, 204 Cal.App.3d at p. 338.) Unlike in *Jeff*, Dr. Thomas did not examine or interview Doe and did not testify as to Doe's post molestation behavior and statements. Dr. Thomas did not refer to specific events, people, and personalities or provide opinion testimony as to Doe's credibility based on any diagnosis of Doe. Dr. Thomas stated she did not even know Doe's actual name or the case involving Doe.

Dr. Thomas's testimony was provided solely to explain Doe's delay in reporting the sexual abuse, maintaining secrecy during the abuse, and accommodation in order to keep the peace and avoid defendant's anger and getting in trouble. Dr. Thomas's expert psychological testimony was thus appropriately used to aid the jury's assessment of Doe's

19

behavior and credibility, and to dispel certain common misconceptions regarding the behavior of sexual abuse victims.  (*People v. Housley*, *supra*, 6 Cal.App.4th at p. 956.)

V.

INSTRUCTION ON FRESH-COMPLAINT DOCTRINE

Defendant contends the trial court prejudicially erred in denying his proposed limiting instruction on evidence admitted under the fresh-complaint doctrine.  We disagree.

A. *Applicable Law*

Under the fresh-complaint doctrine, "the victim's extrajudicial 'complaint' is admissible for a limited, nonhearsay purpose—namely, simply to establish that such a complaint was made—in order to forestall the trier of fact from inferring erroneously that no complaint was made, and from further concluding, as a result of that mistaken inference, that the victim in fact had not been sexually assaulted."  (*People v. Brown* (1994) 8 Cal.4th 746, 748-749.)  Such properly admitted evidence of the victim's complaint is "narrowly limited to the fact of, and the circumstances surrounding, her disclosure of the alleged sexual molestation."  (*Id*. at p. 750.)  "[T]he 'freshness' of a complaint, and the 'volunteered' nature of the complaint, should not be viewed as essential prerequisites to the admissibility of such evidence."  (*Id*. at pp. 749-750.)

Because of the limited purpose for which the victim's out-of-court statements may be admitted as a fresh complaint, "the trial court upon request must instruct the jury to consider such evidence only for the purpose of establishing that a complaint was made,

20

so as to dispel any erroneous inference that the victim was silent, but not as proof of the truth of the content of the victim's statement." (*Brown*, *supra*, 8 Cal.4th at p. 757.)

B. *Procedural Background*

Before the trial, defendant filed a pretrial brief requesting the trial court to limit evidence of Doe's fresh-complaint statements to Mother that defendant had molested her. During the pretrial hearing on the matter, the parties agreed a limiting instruction on such evidence should be given. The trial court stated during the hearing that it would allow the fresh-complaint testimony "for the non hearsay purpose. . . . And it obviously would be the generalities of a molestation or incident that occurred, not too deep into specifics." The trial court requested the parties to agree on a proposed limiting instruction on the evidence.

Defendant submitted the following proposed jury instruction, which is a modified version of CALCRIM No. 303: "Evidence that Jane Doe made a complaint that she had been abused is admitted for the limited purpose of establishing that a complaint was made, so as to dispel any erroneous inference that Jane Doe was silent. You may consider that evidence only for that purpose and for no other. It is not to be considered by you as proof of the truth of the content of Jane Doe's statement, nor is it to be considered as tending to prove the truth of the charges."

The trial court rejected defendant's proposed special instruction, and instead gave the following limiting instruction before Mother testified about the first time Doe told her that defendant had molested her: "Ladies and gentlemen, at this point some of the

21

evidence that is about to be gotten into by the parties is what we call a fresh complaint doctrine. It is a hearsay statement, and the court is directing the jury not to consider the statement for the truth of what is contained in any statement made to the witness. The statement is to be considered for the fact that a complaint was made and the timing of that complaint, and that is what the jury is limited to considering it for, not for what the actual substance of that complaint was to the testimony of this witness at this time."

After Mother's testimony, defendant again requested the trial court to give the jury his proposed special instruction on the fresh-complaint doctrine. The trial court responded that it had already given an adequate instruction, which was simpler than defendant's proposed special instruction. The court noted that defendant's instruction stated more than case law required.

At the end of the trial, defendant again requested the trial court to give his proposed fresh-complaint special instruction, which he argued tracked the language in *Brown*, *supra*, 8 Cal.4th 746. The trial court stated that it had already given a limiting instruction on the fresh-complaint doctrine before Mother testified, and that was adequate. The trial court said that it would give CALCRIM No. 303 when instructing the jury at the end of the trial to remind the jury of the limitations on relying on the evidence, and that should be sufficient.

At the end of the trial, the court instructed the jury on the fresh-complaint doctrine by giving CALCRIM No. 303, stating: "During the trial, certain evidence was admitted

22

for a limited purpose. You may consider that evidence only for that purpose and for no other."

C. *Analysis*

Defendant argues that the trial court erred in rejecting his proposed special instruction on fresh-complaint evidence, because his proposed instruction tracked the language set forth in *Brown*, *supra*, 8 Cal.4th 746. Defendant asserts that the limiting instruction given during Mother's testimony and the CALCRIM No. 303 instruction given at the end of the trial did not specify the limited purpose of the evidence or that it was not proof that Doe's statements were true. Defendant argues that, without such additional instruction, the jury may have viewed the fresh-complaint evidence as proof defendant molested her.

We apply the independent, de novo standard of review when assessing whether the instructions on fresh-complaint evidence were adequate. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In doing so, we conclude there was no instructional error. The trial court gave a proper limiting instruction on the fresh-complaint doctrine before Mother testified regarding Doe's disclosure that defendant had molested her. The court sufficiently explained to the jury that the testimony was to be considered only to establish that Doe made a complaint, the substance of the complaint, and the timing of that complaint. CALCRIM No. 303, given at the end of the trial, further reinforced that Mother's testimony regarding Doe disclosing the sexual abuse could be considered only for the limited purpose of establishing Doe's disclosure of the molestation, and for no

23

other purpose. These instructions were consistent with *Brown*, *supra*, 8 Cal.4th at pages 749-750.

Even though the trial court's mid-trial limiting instruction on the fresh-complaint doctrine and jury instruction at the end of the trial did not include language specifying the limited purpose of the evidence or that it was not proof that Doe's statements were true, the instructions clearly stated Mother's hearsay testimony was not to be considered for the truth of the statements Doe made to her. The fresh-complaint instructions were sufficient because they adequately and correctly admonished the jury that reliance on the evidence was limited to the facts that Doe made the sexual abuse complaint and when she made the complaint. We therefore conclude there was no error in not giving defendant's proposed instruction on the fresh-complaint doctrine.

## VI.

## PROSECUTORIAL MISCONDUCT

Defendant contends there were four instances of prosecutorial misconduct committed during the prosecutor's closing argument. The prosecutorial misconduct consisted of (1) making statements eliciting sympathy for the victim; (2) vouching that Doe's testimony was credible; (3) misstating the law regarding the burden of proof; and (4) incorrectly shifting the burden of proof onto defendant. The People disagree and argue that defendant forfeited these objections by not raising each of them in the trial court or requesting an admonition. Defendant asserts that, to the extent his objections were forfeited, his attorney committed ineffective representation.

Regardless of whether defendants various malicious prosecution objections were forfeited by defendant not objecting to them during the prosecutor's rebuttal, we exercise our discretion to decide the issues on the merits and conclude there was no prejudicial prosecutorial misconduct. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [court has discretion to consider issue even though waived due to failure to object].)

A. *Applicable Law Regarding Prosecutorial Misconduct*

"Under the federal standard, prosecutorial misconduct that infects the trial with such '"unfairness as to make the resulting conviction a denial of due process"' is reversible error. [Citation.] In contrast, under our state law, prosecutorial misconduct is reversible error where the prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' [citation] and '"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [Citation]. To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and, unless an admonition would not have cured the harm, ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct. [Citation.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 955-956.) A finding of prosecutorial misconduct requires "'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Carter* (2005) 36 Cal.4th 1215, 1263.)

A prosecutor is given wide latitude during closing argument. "'""The argument may be vigorous as long as it amounts to fair comment on the evidence, which can

include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." [Citation.] "A prosecutor may 'vigorously argue his case . . . .'"" [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 153, 221; *People v. Hill* (1998) 17 Cal.4th 800, 819.) "Prosecutors, however, are held to an elevated standard of conduct." (*People v. Hill*, *supra*, 17 Cal.4th at pp. 819-820.)

B. *Eliciting Sympathy*

Defendant contends the prosecutor improperly elicited sympathy for Doe by asking Mother during her testimony about the effect of the trial on her and Doe's lives, and by arguing during closing argument that Doe wanted a normal life, but defendant stole her innocence, and her first sexual encounter was when defendant molested her.

During Mother's testimony, the prosecutor asked: "Because this process, coming to court, having to bring your daughter here, has that had any effect on your life?" Defendant objected based on "Foundation. Relevance. 352. Improper. Passion. Prejudice." The court overruled the objection. Mother answered that it was a "very sad situation. It's sad for our family. But the most effect this has is on (Jane Doe)." The prosecutor asked why that was, and Mother stated: "Because she's—it changed—it changed her. Like, her innocence was taken away." Defendant objected and moved to strike the response. The court sustained the objection and ordered Mother's response stricken.

26

During closing argument, the prosecutor argued that during Doe's testimony, "[s]he asked the one question that she will continue to ask for the rest of her life. Why did he do that? All I wanted was a normal life. Why did he do that?' [¶] (Jane Doe), instead of asking, I wonder if he'll like my significant other --." Defendant objected on the ground the prosecutor was improperly appealing to the passion and prejudice of the jury. The court overruled the objection. The prosecutor concluded her closing argument by stating: "And the defendant stole (Jane Doe)'s, his own daughter's innocence three years ago. But it was replaced. It was replaced by the horrific memories of what he did to her. . . . It was replaced with the memory and the reality that her first sexual encounter wasn't with a boy that she loved but with a man that molested her." Defendant did not object or request an admonition regarding these statements.

As to the prosecutor asking about the impact of the trial on Doe and Mother, the trial court sustained defendant's objection and ordered Mother's answer stricken after Mother answered that it was a sad situation for Doe and her family because Doe's innocence was taken away. Mother's statement was brief and the jury was told not to consider it. Although the jury nevertheless heard it, it was not prejudicial error.

As to the prosecutor's closing argument that the prosecutor's statements improperly elicited the jury's sympathy, the jury likely already sympathized with Doe as a result of the other evidence of defendant molesting her multiple times, against her will, when she was seven years old. It is unlikely the prosecutor's argument evoked sympathy

27

the jury did not already have for Doe or significantly increased it.  The prosecutor's

argument stated the obvious, which could be reasonably inferred from the trial evidence.

As noted above, a prosecutor has wide latitude during argument, and we conclude

the prosecutor's argument was within that wide latitude.  The argument amounted to fair

comment on the evidence.  It included reasonable inferences and deductions that could be

drawn from the evidence, founded on common knowledge and experience.  (*People v.*

*Williams*, *supra*, 16 Cal.4th at p. 221; *People v. Hill*, *supra*, 17 Cal.4th at p. 819.)  "In our

view, the challenged comments generally fall within the permitted range of fair comment

on the evidence."  (*People v. Coffman* and *Marlow* (2004) 34 Cal.4th 1, 95.)

We therefore conclude the questioning of Mother during the trial and closing

argument, which defendant argues improperly evoked sympathy for Doe, did not

constitute unfairness as to make the resulting conviction a denial of due process, nor did

it constitute deceptive or reprehensible methods to persuade the jury defendant was

guilty.  In addition, it is not reasonably probable that a result more favorable to the

defendant would have been reached had the prosecutor not made the subject statements

and argument.  (*People v. Martinez*, *supra*, 47 Cal.4th at pp. 955-956.)

C. *Vouching*

Defendant contends the prosecutor improperly vouched for Doe's credibility and

relied on evidence outside the record.  Specifically, defendant argues the prosecutor

committed misconduct by stating that Doe was not making up or remembering something

that her mother told her, when describing defendant's genitals.  We disagree that this was

28

prosecutorial misconduct.

"'Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or (2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument.' [Citation.]" (*People v. Rodriguez* (2020) 9 Cal.5th 474, 480.) Statements of supposed facts not in evidence are highly prejudicial misconduct. (*Ibid*.)

Here, viewing the prosecutor's argument as a whole, we conclude there was no improper vouching or relying on facts outside the record. The prosecutor properly argued reasonable inferences founded on Doe's videotaped statements and trial testimony. The prosecutor stated in relevant part the following: Doe "wasn't reciting a story. She was reliving what she experienced, what she remembered." The prosecutor described Doe's appearance and expressions when testifying, and summarized Doe's description of defendant's genitals and performing oral copulation on defendant. The prosecutor stated, "She's not making that up. No child of that age, that cognitive level could make that up. Because she's not an award-winning actress. She's just a kid."

The prosecutor further argued that Doe's testimony about oral copulation was consistent. The prosecutor rhetorically asked, "How could she be that consistent and tell us that level of detail all these years later?" She did not remember everything she had stated in the forensic interview, "[b]ut she was consistent about the substance and the nature of the oral copulation. And those inconsistencies, those minor details, isn't that what we would expect? . . . But the fact that she was inconsistent and struggled to

29

remember and clearly remembered what happened the most, that's proof that she is telling the truth and not just reciting some story that she's memorized." The prosecutor added, "Why would she come in here, if she's teamed up with mom and they are out to get the defendant, right, and she knows the plan, why, when her veracity is being scrutinized, she is being put to the test, why come in here and sit there and say there are things I don't remember, I'm doing my best?"

The prosecutor showed the jury the video of Doe's forensic interview, along with interspersed commentary by the prosecutor. After playing part of the video, the prosecutor stated: "And we are supposed to believe that this mom concocted this story and told (Jane Doe) what to say and how to say it and implied these sexual innuendos that no child, certainly of that age and cognitive level, would understand let alone be able to repeat with that inflection." After continuing the video showing Doe describing defendant's genitals, and his and her conduct, the prosecutor paused the video and stated Doe was describing defendant's genitals "just like she did for us on the stand. No child would remember that. Okay? She's not reciting a story. She is reliving something that she experienced."

The prosecutor resumed playing the video, paused it and commented: "And we are supposed to believe that a mom told her seven-year-old daughter . . . that's what she experienced, what she felt. . . . And she's not making that up or remembering something that her mom told her because you cannot make that up and no child could keep up with a lie like that."

30

Considering the prosecutor's argument as a whole, we conclude it did not constitute improper vouching. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203 [We "view the statements in the context of the argument as a whole"]; *People v. Rodriguez, supra*, 9 Cal.5th at p. 480.) The prosecutor did not rely on facts outside the record or invoke the prestige of the prosecutor or her office. Rather, the prosecutor's argument discussed Doe's videotaped forensic video viewed by the jury and Doe's trial testimony, and urged the jury to make reasonable inferences from the trial evidence. A prosecutor is permitted to argue all reasonable inferences from the record, and "has a broad range within which to argue the facts and the law." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757; see also *People v. Rodriguez, supra*, at p. 480.) A prosecutor may also make assurances regarding the apparent honesty or reliability of a witness based on the evidence in the record and inferences reasonably drawn therefrom. (*People v. Redd* (2010) 48 Cal.4th 691, 740; *People v. Rodriguez, supra*, at p. 480.) We therefore reject defendant's contention the prosecutor engaged in improper vouching.

D. *Misstating the Law*

Defendant contends the prosecutor misstated the law on reasonable doubt and on how to assess the credibility of a witness who deliberately lies. During rebuttal, the prosecutor stated that the prosecution had the burden of proof, consisting of proof beyond a reasonable doubt. Defendant argues the prosecution diminished its burden of proof by incorrectly stating that proof beyond a reasonable doubt means "proof that leaves you with an abiding conviction. . . . It's not we want more. That's not at all what a

31

reasonable doubt is. You can believe, I have an abiding conviction that this is true. I believe that this happened beyond a reasonable doubt. But I wish I knew that or I wish I knew this. You absolutely must not speculate. The law tells you, you must not speculate. And wanting more is not a reasonable doubt. [¶] And you may have that abiding conviction despite uncertainties or some doubt because a doubt must be reasonable. [¶] Incomplete information. If witnesses were wrong, if there is a dispute or conflicting evidence, you can still have an abiding conviction and have these things. Right? Any doubt you have must be a reasonable doubt. Not just uncertainty. But not some doubt. Not just some possibility or speculation. Because the law says you must not speculate. [¶] And this is obviously not to scale, to be clear. Reasonable doubt is not the same thing as absolute certainty. Because remember, you can have an abiding conviction and still have some uncertainty."

### 1. Beyond a Reasonable Doubt

Defendant argues the prosecutor erred in telling the jury that reasonable doubt is not merely wanting more information or having uncertainties or some doubt. In *People v. Centeno* (2014) 60 Cal.4th 659, 672, the court explained: "It is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory. (See, e.g., CALCRIM Nos. 224, 226.) It is permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts. (See, e.g., CALCRIM Nos. 226, 300.) It is certainly proper to urge that the jury consider all the evidence before it.

(§ 1096; CALCRIM No. 220.)"

The court in *Centeno* concluded that the prosecutor erred in telling jurors during closing argument that they must reject the impossible and unreasonable, and only consider reasonable possibilities. But simply believing a conclusion is reasonable is not enough to satisfy the burden of proof beyond a reasonable doubt. The jury must find that all necessary facts have been proven beyond a reasonable doubt. (*People v. Centeno*, *supra*, 60 Cal.4th at pp. 671-672.) Unlike in *Centeno*, here, the prosecutor did not suggest defendant could be found guilty based on merely a reasonable conclusion or account.

As our high court stated in *People v. Ramirez* (2022) 14 Cal.5th 176, 189, the beyond-a-reasonable-doubt standard burden of proof "requires the trier of fact to hold 'an abiding conviction that the charge is true' although it 'need not eliminate all possible doubt.'" (See also CALCRIM No. 220; § 1096.) The prosecutor's rebuttal argument was consistent with section 1096's definition of "reasonable doubt" and with *Ramirez*.

As to the prosecutor's statement that "wanting more is not reasonable doubt," defendant did not object to this statement, and even if the prosecutor erred in making the statement, it was harmless error, because it is not likely it made any difference in the outcome of the case, particularly since the jury was properly instructed on reasonable doubt. We therefore reject defendant's contention the prosecutor committed reversible error by misstating the law on reasonable doubt.

33

2. Assessment of Credibility of a Witness Who Deliberately Lies

Defendant argues the prosecutor committed misconduct during rebuttal by misstating jury instruction CALJIC No. 226 on how to assess the credibility of a witness who deliberately lies.

The prosecutor acknowledged during rebuttal that Doe admitted that, during her forensic interview, she lied. The prosecutor stated that CALJIC No. 226 states in part that "[i]f you decide that a witness deliberately lied about something significant in this case, you should not consider believing anything the witness says." Defendant objected on the ground the prosecutor misstated the law. The trial court overruled the objection. The prosecutor told the jury it was provided with a copy of the instruction, which was the same as the prosecutor's copy, and they could look at it. The prosecutor added: "So to say that (Jane Doe) is lying because nobody thought to question her about that, right, no one questioned her, we would have believed it when we heard it, so everything else must be a lie is absolutely inaccurate."

Defendant argues that the prosecutor's statement, "you should *not* consider believing anything the witness says," was confusing and erroneous, because the word "not" was stated before, rather than after the word, "consider." But even assuming this, the statement was brief and the court properly instructed the jury with CALJIC No. 226. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894 ["'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'"]; *People v. Meneses* (2019) 41 Cal.App.5th 63, 74.)

34

Also, defense counsel discussed CALCRIM No. 226 during closing argument and displayed it during his power point presentation. In addition, the jury had access to the instruction to review, and the prosecution appropriately discussed it, other than the single, brief, confusing statement. We therefore conclude "there was no prosecutorial error because in the context of the entire argument and jury instructions, it was not reasonably likely the jury understood or applied the statement in an improper or erroneous manner." (*People v. Meneses*, *supra*, 41 Cal.App.5th at p. 73.)

E. *Shifting the Burden of Proof*

Defendant argues the prosecutor improperly suggested defendant had the burden of proof when the prosecutor asked the jury rhetorically during rebuttal why defense counsel did not ask Doe during cross-examination about the particulars of the molestation incidents. Defendant argues the inference was that defense counsel should have engaged in such questioning to prove defendant was not guilty. Defendant did not object in the trial court to the prosecutor's argument.

Defendant now objects to the prosecutor's following rebuttal argument: "Look, we all talked about it's my burden to bear, right? Defense has absolutely no burden. We have heard that time and time again. But if it really didn't happen, it's a lie, it's a false memory. Why didn't defense counsel ask (Jane Doe) a single question about the event of the molestation? If there were holes to be poked in the story, why not poke them? . . . Why not ask her, did it happen? Are you making it all up? . . . No burden, but he did cross-examine her." The prosecutor further stated, "And I asked you in jury selection,

35

right, I asked you to hold me to my burden. And I explained what that meant, right? I explained to you if I proved my case beyond a reasonable doubt how you must vote. And you all told me you'd vote guilty if I proved this case to you beyond a reasonable doubt." The prosecutor concluded, stating she had done so.

It is improper for the prosecutor to suggest that a defendant has a duty or burden to prove his or her innocence. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) Under *Griffin v. California* (1965) 380 U.S. 609, the prosecution may not comment upon a defendant not testifying on his or her own behalf, but this does not "extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*People v. Bradford*, *supra*, at p. 1339.) "A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Id*. at p. 1340.)

Here, the portion of the prosecutor's argument in question did not state defendant had a burden to produce evidence or testify or prove his innocence. The prosecutor's argument commented on Doe's testimony and defense counsel's failure to ask her if defendant molested her or if she had lied about it. Contrary to defendant's assertion, such argument does not constitute prejudicial error. The prosecutor's comments concerned defense counsel's failure to ask Doe questions during cross-examination. There was no mention of defendant not testifying or that proving his innocence required him to ask Doe

additional questions.  Furthermore, the prosecutor repeatedly acknowledged that the prosecution had the burden of proof, not defendant.  The prosecutor's comments during rebuttal therefore did not impermissibly shift the burden of proof to defendant.

VII.

SENTENCING ERROR

Defendant contends the trial court erred in imposing consecutive, mid-term sentences for counts 3, 4, and 5.[4]  Defendant also argues that the trial court failed to weigh mitigating factors and appeared to be unaware it had discretion to impose the low term on counts 3, 4, and 5.  We disagree.  The record shows the trial court was aware of its discretion and appropriately exercised it when sentencing defendant on counts 3, 4, and 5.

The trial court has broad discretion when sentencing.  It "'"'is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'"'"  (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.)  If the record is silent, the defendant has failed to sustain his burden of proving error, and this court must affirm.  (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229; *People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322 ["Unless the record affirmatively demonstrates otherwise, the trial court is deemed to have considered all the relevant sentencing factors set forth in the rules."].)

---

[4]  Counts 3 and 4 allege lewd and lascivious acts on Doe, a child under 14 years old, by force or fear (§ 288, subd. (b)(1)).  Count 5 alleges lewd and lascivious acts on Doe, a child under 14 years old, by force or fear (§ 288, subd. (b)(1)).

The sentencing probation report stated the following aggravating factors: The charged crimes involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; the victim was particularly vulnerable; defendant threatened witnesses or unlawfully dissuaded witnesses from testifying; the crimes were carried out with planning or sophistication; defendant took advantage of a position of trust or confidence; defendant engaged in violent conduct indicating a serious danger to society; defendant's prior convictions were numerous or of increasing seriousness; and the victim was unable to defend herself because of her age. The only mitigating factors were that defendant had no prior record or an insignificant criminal record, and defendant's prior performance on probation or parole was satisfactory.

Defendant requested in his sentencing memorandum and during sentencing that the court sentence him to concurrent, low terms for counts 3, 4, and 5. Defendant requested the court to strike the aggravating factors stated in the probation report because they were not found true beyond a reasonable doubt or stipulated to by both parties. In addition, defendant argued that some of the aggravating factors, such as the victim's youth and vulnerability, and defendant threatening witnesses, were improper because they are elements of the underlying offenses. Defendant argued threatening witnesses is the same type of conduct as duress, which is an element of a section 288, subdivision (b) offense (count 5).

The prosecution filed opposition to defendant's sentencing brief. During sentencing, the prosecutor objected to the court striking any of the aggravating and mitigating factors. The prosecutor argued that, although the court could not impose the upper term on count 5, the court could consider the aggravating factors to determine which other terms to apply to count 5, and whether to impose consecutive or concurrent terms.

The court agreed that, because there were no findings that the aggravating factors were proven beyond a reasonable doubt or stipulated, the court could not impose an upper term. The People submitted on their sentencing brief. Defendant requested the court to impose the low term on counts 3, 4, and 5, with one of the two section 288, subdivision (a) counts running concurrently. The court stated that "consecutive sentencing is appropriate based upon the independently proven acts of serious or violent conduct with regards to the minor child." The court further stated that, as to count 3, "based upon facts and circumstances and nature of the crimes committed," the court imposed the midterm of six years on count 3 as the principal determinate term. As to count 4, the court imposed one third the midterm for a total term of two years  And as to count 5, the court imposed under section 667.6, subdivision (d), "a full, separate, consecutive midterm of eight years."

Under section 1170, subdivision (b), the trial court had the option of imposing an upper, middle, or low term.  (§ 1170, subd.(b)(1).)  A fact that is an element of the crime may not be used to impose a particular term.  (Cal. Rules of Court, rule 4.420.)  The trial

39

court also had discretion to impose consecutive sentences on counts 3, 4, and 5. "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act. We therefore decline to extend the single intent and objective test of section 654 beyond its purpose to preclude punishment for each such act." (*People v. Perez* (1979) 23 Cal.3d 545, 553.)

Section 667.6, subdivision (c) provides that "a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion. A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e). If the term is imposed consecutively pursuant to this subdivision, it shall be served consecutively to any other term of imprisonment, and shall commence from the time the person otherwise would have been released from imprisonment." Count 5 is an offense specified in section 667.6, subdivision (e). (See § 667.6, subd. (e)(5).) The trial court therefore properly exercised its discretion by imposing consecutive sentences on counts 3, 4, and 5, which involved crimes independent of one another and were temporally and spatially separate.

Defendant argues the trial court failed to exercise its discretion to impose the lower term, rather than the middle term, for counts 3, 4, and 5. Nothing in the record supports this assumption or that the court was unaware of its sentencing discretion. The court's comments during sentencing indicate it was aware of its discretion to impose a

low or middle term, and had discretion to impose either consecutive or concurrent terms. The court stated that consecutive sentencing was "appropriate based upon the independently proven acts of serious or violent conduct with regards to the minor child," and the trial court imposed mid-terms "based upon facts and circumstances and nature of the crimes committed." Based on the trial court's comments, it can be reasonably inferred that the court was aware of the scope of its sentencing discretion and appropriately considered the facts, circumstances, and nature of the crimes when imposing consecutive, mid-terms for counts 3, 4, and 5. We therefore conclude defendant has not demonstrated there was sentencing error.

## VIII.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

RAPHAEL
J.

MENETREZ
J.

41

[*People v. Dominguez*, E080878]

RAPHAEL, J., concurring.

I join our opinion and agree with it in full.

In its section III, the opinion holds that "even though the trial court erred in requiring defendant to wear leg restraints during his trial, it was harmless error." (Maj. opn., *ante*, at p. 13.) I agree, but I would explain briefly *why* the trial court erred.

In *People v. Bracamontes* (2022) 12 Cal.5th 977, 991 (*Bracamontes*), our Supreme Court stated that "physical restraints are considered extraordinary measures," so a court must "seriously consider" on an "individualized basis" whether they are warranted and "ensure there is an adequate record" supporting its ruling. "The individualized consideration necessary before imposing restraints would be inconsistent with a blanket policy of shackling defendants charged with certain offenses, such as capital murder." (*Ibid.*)

Before and during trial, defendant sought to be free of the restraint, referred to in our record as a "hobble device." The trial court articulated just one reason for requiring the hobble device during trial: that defendant was "looking at a life term." This is not sufficient. It means that any defendant who faced a life term could be subject to the hobble device if law enforcement requests it. That is not the individualized determination that *Bracamontes* contemplated. It is tantamount to the forbidden "blanket policy of shackling defendants charged with certain offenses," because it deems appropriate for the hobble device all defendants charged with a life-term offense. (*Bracamontes*, *supra*, 12 Cal.5th at p. 991.)

1

The trial court diligently focused on protecting against prejudice from defendant's wearing the hobble device, such as ensuring that it would not be visible to the jury. As important as that is to our prejudice inquiry, it is not the individualized determination needed to support requiring the device in the first place.

Our Supreme Court has grounded the reasons to treat shackling as an extraordinary measure not only in the " 'possible prejudice in the minds of the jurors,' " but also in " 'the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand.' " (*People v. Mar* (2002) 28 Cal.4th 1201, 1216; see also *People v. Duran* (1976) 16 Cal.3d 282, 290 ["physical restraints should be used as a last resort not only because of the prejudice created in the jurors' minds, but also because 'the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' "] [quoting *Illinois v. Allen* (1970) 397 U.S. 337, 344].)

It may be that individualized reasons supported use of the hobble device here, but the trial court did not allude to them. I am writing to explain that error, and, through doing so, to encourage trial judges to avoid the error by making the individualized determination on the record as *Bracamontes* requires, regardless of whether the error would turn out to be sufficiently prejudicial to reverse a conviction.

RAPHAEL _____

I concur:

MENETREZ _____

J.

2